**AIRCRAFT MECHANICS FRATER-
NAL ASSOCIATION et al.,
Plaintiffs,**

v.

**UNITED AIRLINES, INC., Defendant.**

No. C–75–2060SC.

United States District Court,
N. D. California.

Order Dissolving Temporary Restraining
Order made from Bench Oct.
15, 1975.

Jan. 6, 1976.

Thornton C. Bunch, Jr., San Francisco, Cal., Andrew E. Zelman, Surrey, Karasik, Morse & Seham, New York City, for plaintiffs.

Arnold T. Aikens, Michael A. Katz, Washington, D.C., Robert S. Rankin, Jr., United Airlines, Inc., Chicago, Ill., John B. Marchant, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendant.

## AMENDED MEMORANDUM DECISION

CONTI, District Judge.

This action for injunctive relief is brought by the Aircraft Mechanics Fraternal Association (AMFA) and four individuals employed by United Air Lines, Inc. in the class or craft of mechanics and related employees, within the meaning of the Railway Labor Act (Act or RLA), 45 U.S.C. §§ 151–188. Plaintiffs would have this court enjoin, pending final disposition of plaintiffs' "Application for Investigation of Representation Dispute" which is now before the National Mediation Board (NMB), (1) any negotiations concerning a new collective bargaining agreement between defendant United Air Lines and intervenor International Association of Machinists (IAM), which is the current NMB-certified exclusive bargaining representative of the class and craft of mechanics and related employees of United Air Lines throughout the United States; (2) United's enforcement of its policy prohibiting its employees from distributing union campaign literature on United property, insofar as it extends to the distribution of such literature in non-working areas and on non-working time; and (3) United's alleged discrimination in allowing IAM employee and non-employee supporters, but not AMFA supporters, to engage in election, organizational and campaign activities on United property.

At the present time, United is a party to a collective bargaining agreement with the representative of its employees in the mechanics and related employees class or craft. That representative is IAM, having been certified as such by the National Mediation Board in July of 1945. United is also a party to separate collective bargaining agreements with its ramp and stores employees, food service

employees and dispatchers. IAM is the certified bargaining representative for each of these groups as well. All four of the collective agreements are subject to change on November 1, 1975. Historically, United and IAM have negotiated these agreements simultaneously and bargaining considerations often overlap.

On August 20, 1975, AMFA petitioned the NMB alleging the existence of a representation dispute among the employees of United, presently represented by the IAM, in the craft or class of airline mechanics and related employees. In accordance with NMB Rules and Regulations, 29 C.F.R. § 1206.2, AMFA submitted authorization cards from over 50% of the employees in the craft or class designating it as the representative for purposes of collective bargaining of the signatory employees. On September 19, 1975, the NMB notified AMFA of its determination that a labor dispute existed with respect to representation, authorizing an election by mail ballot, to be held following NMB's determination of employee voting eligibility and preparation of ballots. On September 25, 1975, United notified the NMB of its objection to the NMB's prior exclusion of the ramp servicemen and storekeepers from the mechanics and related employees craft or class. United requested the NMB to reconsider the craft determination, which, if granted, could bear directly on AMFA's card majority status, since some 5,000 additional employees would come into the class or craft.

Upon receiving the NMB's determination that a dispute existed with respect to representation, AMFA made a demand upon United that it cease negotiating with IAM. This demand United refused to honor. AMFA thereupon came into this court seeking relief in the form of a temporary restraining order, which was granted on September 30, 1975. The effect of the order was to terminate United's negotiations with IAM, which had begun in early September pursuant to a pre-arranged expedited bargaining schedule which it had been hoped would produce an agreement on a new contract prior to November 1, 1975, the date of expiration of the old contract. Plaintiffs now request that this court extend the effect of its order "freezing" the status quo until such time as the NMB resolves the dispute over bargaining representation.[1]

Having carefully and assiduously researched the question here presented, the court concludes that it is without jurisdiction in this matter and directs that the earlier order be dissolved.

This case, one of first impression, presents in clear focus the issue of the relative roles of the district courts and the National Mediation Board in effectuating the purposes of the Railway Labor Act of 1926, as amended, 45 U.S.C. §§ 151–188. As will be seen, it has been necessary for this court to draw fine distinctions between provisions of the Act as to which judicial intervention is proper and those whose enforcement Congress has left exclusively to the NMB.

The history of the present Railway Labor Act begins with Title III of the Transportation Act of 1920, Chap. 91, 41 Stat. 456, 469, in which, inter alia, Congress established the Railroad Labor

1. As noted, United and IAM requested that the NMB hold a craft or class determination hearing with respect to the inclusion of ramp and store employees in the mechanics and related employees craft or class. AMFA does not request this court to enjoin negotiations pending resolution by the NMB of *both* the class determination and the representation dispute, which could take several months. Rather, AMFA requests that an injunction issue which would continue in effect only in the event that the NMB denies the class determination hearing.

AMFA brings to our attention, however, that United and IAM submitted an identical class re-determination request to the NMB in 1968, which, after extensive hearings before the NMB, was denied, the Board finding that the more appropriate class or craft of mechanics and related employees excluded the ramp and store employees. See *United Air Lines, Inc.*, N.M.B. Case R–3938 (July 22, 1968). AMFA thus believes that the NMB will very likely deny the class determination hearing request and the only waiting period required will be that of preparation for and conduct of the election of bargaining representative.

Board as a means for the peaceful settlement, by agreement or by arbitration, of labor controversies between interstate carriers and their employees. The Act sought "to encourage settlement without strikes, first by conference between the parties, failing that, by reference to adjustment boards of the parties' own choosing and, if this is ineffective, by a full hearing before a national board . . . ." *Pennsylvania R. Co. v. United States R. Labor Board*, 261 U.S. 72, 43 S.Ct. 278, 67 L.Ed. 536 (1923). The decisions of the Board were supported by no legal sanctions, however. The disputants were not in any way "to be forced into compliance with the statute or with the judgments pronounced by the Labor Board, except through the effect of adverse public opinion." *Pennsylvania R. System v. Pennsylvania R. Co.*, 267 U.S. 203, 45 S.Ct. 307, 69 L.Ed. 574 (1925).

The Railroad Labor Board had jurisdiction to hear and decide disputes over rules and working conditions upon the application of either side, when the parties had failed to agree and an adjustment board had not been organized. The board also had jurisdiction to decide who might represent the employees in the conferences contemplated by the statute and to make reasonable rules for ascertaining the employees' will in this respect. But judicial interference by injunction with the exercise of the discretion of the Board in the matters committed to it, and with the publication of its opinion, was decided to be unwarranted. *Pennsylvania R. Co. v. United States R. Labor Bd., supra.* Publication of the Board's decision was thought by Congress to be sufficient to arouse such public criticism of the party felt to be at fault as to vindicate, through moral constraint, "the economic interest of every member of the public in the undisturbed flow of interstate commerce and the acute inconvenience to which all must be subjected by an interruption caused by a serious and widespread labor dispute . . . ." *Id.*, 261 U.S. at 79–80, 43 S.Ct. at 281. Congress assumed that the parties would comply voluntarily with the Board's decisions, and thus did not grant the courts jurisdiction to compel compliance.

Voluntary compliance was not forthcoming.[2] Thus Congress undertook to enact legislation with a stronger bite. The result was the Railway Labor Act of 1926. It embodied an agreement of a large majority of representative committees of railroad presidents and of executives of railroad labor organizations. See Report by the Committee of Interstate and Foreign Commerce to the House of Representatives, 69th Cong., 1st Sess., H.R.Rep.No.328. The Act substituted a United States Board of Mediation for the old Railroad Labor Board. Congress in the new statute adhered to the policy of providing for the amicable adjustment of labor disputes; and for voluntary submissions to arbitration as opposed to compulsory arbitration, but provided that an award pursuant to arbitration before the Board was to be enforceable in the courts, with the Board's determination accorded conclusive status. See 45 U.S.C. § 159. In addition, the board was directed, once it had found that a labor dispute, which had not been adjusted under the provisions of the act, threatened an interruption of interstate commerce, to notify the President who, in his discretion, could create an emergency board of investigation to report, within thirty days, with respect to the dispute. See 45 U.S.C. § 160. After the creation of such board and for thirty

---

2. For example, in *Pennsylvania R. System v. Pennsylvania R. Co.*, supra, the Court said that the company was using "every endeavor to avoid compliance with the judgment and principles of the Labor Board as to the proper method of securing representatives of the whole body of its employees", that "it is seeking to control its employees by agreements free from the influence of an independent trade union", and was refusing to comply with board decisions so far as concerned the company's dealings with its employees. But the court held that this conduct was within the strict legal rights of the Railroad Company and that Congress had not intended to make such conduct legally actionable. *Id.*, 267 U.S. at 217, 45 S.Ct. at 311.

days after its report to the President, there was to be no change by the parties in the conditions out of which the dispute arose. *Id.* This section thus provided a mechanism to prevent strikes which could threaten the national interest, and it was clear that Congress intended that the provision be enforceable in the courts. See, *Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks*, 281 U.S. 548, 563–66, 50 S.Ct. 427, 74 L.Ed. 1034 (1929).

It was in the context of the finding that Congress, in enacting the 1926 legislation, clearly intended to impose, and did impose, certain definite obligations enforceable by judicial proceedings, that the Supreme Court in 1929 held that a judicial remedy also existed under subdivision third of Section 2 of the Act (45 U.S.C. § 152, Third) which provides in part that "Representatives, for the purposes of this Act, shall be designated by the respective parties . . . without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other." *Texas & N. O. R. Co., supra.* The court stated:

> The intent of Congress is clear with respect to the sort of conduct that is prohibited. "Interference" with freedom of action and "coercion" refer to well-understood concepts of the law. The meaning of the word "influence" in this clause may be gathered from the context. Noscitur a sociis. (Citation) The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. "Influence" in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls "self-organization." The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the

purposes of this act than in relation to well-known applications of the law with respect to fraud, duress, and undue influence. If Congress intended that the prohibition, as thus construed, should be enforced, the courts would encounter no difficulty in fulfilling its purpose, . . .. *Id.* at 568, 50 S.Ct. at 433.

The Court held that the intention of Congress was that the courts were to provide enforcement of the prohibition.

The prohibition in Section 2, Third, against interference was aimed at a practice in the railroad industry which had gone largely uncontrolled—the organization and maintenance *by the employer* of what was known as a "company union". See, *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 543, 57 S.Ct. 592, 81 L.Ed. 789 (1936). In its classic historical form, as found in the *Texas & N. O. R. Co.* case, supra, the company union had the following attributes: employees of the railroad were permitted to spend considerable time on union affairs without deduction by the company from their pay; the company would pay expenses incurred by union members or supporters in recruiting new members; the company would expect and receive reports from the union supporters concerning recruitment efforts; and the company would discharge or discriminate against supporters of rival unions. It was this type of employer involvement which the court felt rose to the level of Section 2, Third, "interference" with the liberty of the employees in the selection of their bargaining representatives, and as to which judicial enforcement was felt to be within the contemplation of Congress.

Company unionism, however, continued to present a problem. A means was required by which the will of the employees, uninfluenced by the employer, could be ascertained; and, once ascertained, imposed on the employer by mandatory process. Thus, in 1934, Congress undertook to amend the act. The major provision of the 1934 amendments, which substituted the present National

Mediation Board for the old Board of Mediation, was found in Section 2, Ninth, which states in part:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. *Upon receipt of such certification the carrier shall treat with the representative so certified* as the representative of the class or craft for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives *in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier.* (Emphasis added)

The stated purpose of this provision was to outlaw employer attempts to dominate the representatives of its employees.[3] Under the 1926 Act representation disputes could be dealt with by the old United States Mediation Board only by agreement of the parties, which was in-frequent.[4] Under the amendments, however, the new National Mediation Board was specifically empowered to make findings as to representation, and was directed by statute to insure that the representative was designated in an atmosphere free from the taint of employer coercion and influence. Once the Board was assured that this taint was not present, had made its findings, and had certified the designated representative to the carrier, the carrier was under compulsion of law to treat exclusively with that representative. *Virginian Ry. Co.*, supra, 300 U.S. at 547–49, 57 S.Ct. 592. The amendments thus represented a significant increase in the power and authority of the National Mediation Board in the area of representation disputes. It was left unclear in the wake of the amendments whether the Board, having been given the explicit adjudicatory function of investigating representation disputes and certifying the designated representative only upon Board assurance that employer influence was absent, was to have exclusive control in the area of illegal influence, or whether the district courts were still to play a role under the *Texas & N. O. R.* case and Section 2, Third, of the Act in enjoining such influence. Given the explicit increase in Board power and authority, in conjunction with the rationale therefor, it seems more likely as a matter of statutory construction that Congress intended the Board to take over in this area.[5] It is assumed for the purpose of this decision, however, that the district courts still have original jurisdiction under Section 2, Third, over cases involving special facts tending to establish company unionism. As will be seen, these special facts do not exist in this case.

---

3. See Report of House Committee on Interstate and Foreign Commerce, No. 1944, 73rd Cong., 2d Sess., pp. 1–2; also remarks of Representative Crosser, in charge of the bill on the floor, in Hearings, House Committee on Rules, 73rd Cong., 2d Sess., on H.R. 9861, pp. 10–11, 13.

4. See testimony of National Mediation Board Chairman Leiserson, referred to in *Virginian Ry. Co.*, supra, at 546 n. 5, 57 S.Ct. 592.

5. Support for this construction can be found in *Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), decided after the 1934 amendments, in which the Supreme Court noted that in the *Texas & N. O. R.* case, absence of jurisdiction in the federal courts would mean "a sacrifice of obliteration of a right which Congress had created." The Court stated:

The Court has made clear that in a case in which the dispute is solely between two Board-certified unions within one or more employing entities over which of the two is to represent a certain type of employee of the company, the NMB's jurisdiction under Section 2, Ninth, is exclusive, and its decision as to representation is unreviewable. *Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *General Committee v. Missouri-K-T-R Co.*, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943); *General Committee v. Southern P. Co.*, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943). Each of these cases involved competing claims of representation of employees acting in a "hybrid" capacity, i. e. performing functions which logically fell within the scope of representation of both unions. The cases stand for nothing more than that such disputes are within the exclusive jurisdiction of the Board. The Court noted:

It is clear from the legislative history of § 2, Ninth, that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a *wide range of jurisdictional disputes between unions* or between groups of employees. (Citations.) However wide may be the range of jurisdictional disputes embraced within § 2,

In [the *Texas & N. O. R.* and *Virginian Ry.* cases] it was apparent, that but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act. The result would have been that the "right" of collective bargaining was unsupported by any legal sanction. That would have robbed the Act of its vitality and thwarted its purpose. Such considerations are not applicable here. The Act in § 2, Fourth writes into law the "right" of the "majority of any craft or class of employees" to "determine who shall be the representative of the craft or class for the purposes of this Act." *That "right" is protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it* and as an incident thereto to determine what is the appropriate craft or class in which the election should be held. [Citations] *A review by the federal district courts of the Board's determination is not necessary to preserve or protect that "right".* Congress for reasons of its own decided upon the method for the protection of the "right" which it created. It selected the precise machinery and fashioned the tool which it seemed suited to that end. (Emphasis added) *Id.* at 301, 64 S.Ct. at 97. It would be logical to infer from this passage that since the 1934 amendments empowered the Board to protect such "rights", the judicial remedy is no longer necessary. That is to say, the 1934 amendments provided a remedy in a tribunal other than the federal court. See, for example, *Railway Employees' Co-op. Assn. v. Atlanta B. & C. R. Co.*, 22 F.Supp. 510 (D.Ga. 1938), in which the court, presented with a request for an injunction against alleged employer influence in maintaining a company union, noted that the Mediation Board has jurisdiction to designate the lawful representative

and to provide measures to insure a fair, free and uninfluenced expression of the employees' choice, and stated: "The court will not presume that these measures will be insufficient and ineffective." The injunction was denied, but with the reservation that a further request would be entertained if at any time it appeared that influence was threatened "*and beyond the protection of the Mediation Board.*" *Id.* at 514. (Emphasis added). The court stated:

I think that the court should abstain from any possible interference with the jurisdiction of the Mediation Board, unless it should become absolutely necessary to protect complainants' rights, and that the court should not complicate the exercise of the jurisdiction of the Mediation Board by any ruling that might be in the nature of prejudging issues which should properly be passed upon, certainly in the first instance, by the Mediation Board. *Id.* Cf. *Brady v. Trans World Airlines, Inc.*, 223 F.Supp. 361, 365 (D.Del.1963) (dictum).

Also, it is within the Board's power, and is the Board's policy, to deny certification of a union found to be a company union. In fact, the Board refuses to conduct an election upon petition of a company-controlled union. In this manner the Board fulfills its statutory role of insuring that the bargaining representative is chosen without employer influence or coercion. Thus the 1934 amendments gave plenary power to the Board to deal with employer influence in the designation of representatives, rendering judicial intervention unnecessary.

In any event, it is not necessary for the purposes of the instant action to decide the question of the vitality of *Texas & N. O. R.*, for there has been no allegation here of the type of employer influence which rises to the level of company unionism at which the thrust of the judicial remedy granted in the Texas & N. O. R. case was directed.

Ninth, Congress did not select the courts to resolve them. To the contrary, it fashioned an administrative remedy and left that group of disputes to the National Mediation Board. If the present dispute falls within § 2, Ninth, the administrative remedy is exclusive. (Emphasis added.) *Missouri-K-T-R Co.*, supra, at 336, 64 S.Ct. at 152.[6]

■ Judicial intervention under Section 2, Ninth of the Act has been recognized to be appropriate in two areas. The courts have a duty to require the carrier to bargain with the duly designated and Board-certified representative,[7] *Virginian Ry. Co.*, supra, and, very likely, when necessary, a duty to require the Mediation Board to do what Congress commanded, namely, to investigate and certify—the point reserved by the Supreme Court in the *Missouri-M-K-T* case, supra, and decided in *Air Line Dispatchers' Assn. v. National Mediation Bd.*, 89 U.S.App.D.C. 24, 189 F.2d 685, cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951). See, *Ruby v. American Airlines, Inc.*, 323 F.2d 248 (2d Cir. 1963); *WES Chapter, Flight Eng. Int. Assn. v. National Mediation Board*, 114 U.S.App.D.C. 229, 314 F.2d 234 (1962). See also, *Brotherhood of Ry. & S. S. Clerks v. Assn. for Benefit of Non-Contract Employees*, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). In the first role, the court is merely enforcing a decision of the Board, duly arrived at pursuant to the statutory process; in the second, the court is insuring that the Board has not exceeded its statutory authority and is performing according to its statutory mandate. In neither role does the court review a Board decision in the sense of substituting its judgment for that of the Board, or otherwise interfere with its legal function. In determining whether an assertion of jurisdiction under the Act is proper, the court must be vigilant in guarding against the evil of interfering with, or otherwise frustrating, the Board's sensitive role of insuring, to the maximum extent possible, peaceful labor relations in the railroad and airline industries without interruption by strikes or other disruptions of carrier operations which would imperil the national welfare.

■ Finally, there has been recognized, as a corollary to judicial enforcement under section 2, Ninth of a Board certification of bargaining representative, power in the district courts to enforce the duty placed upon carriers and their employees by section 2, First of the Act "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." In *Chicago & N. W. R. Co. v. United Transp. Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), the five-justice majority held that it was permissible for the district courts to oversee the bargaining process to an extent somewhat greater than that represented by enforcement of the section 2, Ninth duty of the carrier to "treat with" the duly chosen and Board-certified bargaining representative, as in the *Virginian Ry. Co.* case. The Court held that there was judicial jurisdiction also to inquire into whether the parties abided by their mutual section 2, First duty to "exert every reasonable effort" to reach an agreement. How far a court can go beyond a mandate that the parties must meet and confer in good faith, remains unclear; but the policy against governmental interference with the substantive terms of agreements is certain and abso-

---

6. Accord, *Burlington Northern, Inc. v. American Ry. Sup. Assn.*, 350 F.Supp. 897 (N.D.Ill. 1972); *Brotherhood of Locomotive Eng. v. National Mediation Bd.*, 284 F.Supp. 344 (D.D.C. 1968).

7. This duty derives from that part of Section 2, Ninth, of the Act which commands that "Upon receipt of such (Board) certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act." The carrier's obligation expressed therein is to bargain exclusively with the certified representative and no other. *Virginian Ry. Co.*, supra, 300 U.S. at 548, 57 S.Ct. 592. This obligation is mandatory, and Congress intended that it was to be enforced, if necessary, in the courts. *Id.* at 545, 57 S.Ct. 592.

lute. See, e. g., *Chicago & N. W. R. Co.*, supra, at 579 n. 11, 583, & 583 n. 19, 91 S.Ct. 1731. The Court did suggest that the inquiry into compliance with the "reasonable effort" duty can, only with "great circumspection," proceed beyond cases involving a "desire not to reach an agreement." *Id.* at 579 n. 11, 91 S.Ct. at 1736. Reversing the holdings below that jurisdiction to enforce the section 2, First duty was exclusive in the National Mediation Board, the Court found that Congress intended that provision to be enforced judicially, for the dual reasons that the Board might well have no way to remedy certain violations of section 2, First, see id. at 581 n. 14, 91 S.Ct. 1731, and that, in any event, placing such a task on the Board could hamper the exercise of its delicate mediatory function, see id. at 580–81, 91 S.Ct. 1731. The Court noted that, lest the effectiveness of the Board's mediatory efforts undertaken pursuant to section 5 of the Act, 45 U.S.C. § 155, be compromised, Congress had granted adjudicatory authority to the Board sparingly, carefully limiting that grant to the administration of or resolution of jurisdictional or representation disputes under section 2, Ninth of the Act, as to which the need was prominent for the expertise of a specialized administrative agency. See *Chicago & N. W. R. Co.*, supra, at 580–81, 91 S.Ct. 1731. This is noteworthy for the instant controversy, because the Board's adjudicative power under section 2, Ninth of the Act is here called into question. See discussion infra. The complaint herein, however, does not attempt to invoke this court's jurisdiction under section 2, First.

The Act's history shows that while Congress dealt with the subject comprehensively, it initially left most of the problems of railway labor to the traditional voluntary processes of conciliation, mediation, and arbitration. As Congress came to appreciate the impotence of the Act as originally conceived, gradually changes were made whereby the compulsion of law could be brought to bear on some of these problems, in the form of enforcement by administrative or judicial tribunals. But this was done slowly and in piece-meal fashion, and with apparent reluctance to remove from the traditional realm of voluntary agreement out of which the Act was born any but the most compelling of railway labor problems as to which enforcement was deemed essential to the national interest. Section 2, Ninth of the Act represented the most significant transfer of power from the parties themselves to an adjudicatory body with the authority to make decisions which were legally binding on the parties. That section lodged primary power in the National Mediation Board, with the federal courts acting as a back-up in the event compliance with Board decision was not forthcoming. Problems having to do with craft or class determination and representation disputes were committed exclusively to the unreviewable discretion of the National Mediation Board, with power in the federal courts to enforce exercises of the Board's discretion. It was only in the rare case where the employer had so completely dominated the labor relations scene as to create an atmosphere wherein free exercise of the employees' will was impossible, that a federal court was empowered to act in the first instance under Section 2, Third. *Texas & N. O. R. Co.*, supra. In such a situation, judicial intervention was appropriate because there might well be no recourse to the National Mediation Board. This is so because the Board's rules require some showing of majority support by a rival union before an investigation will be conducted, possibly leading to an election.[8] If the employer's influence was so

---

8. National Mediation Board Rule 2, 29 C.F.R. Section 1206.2(a) provides that the Board will not authorize an election or otherwise determine the representation desires of the employees under Section 2, Ninth, of the Act, unless there is a showing of "proved", i. e. verified, authorizations from at least a majority of employees. Where the employees are unrepresented, the showing required is at least 35% of employees. 29 C.F.R. Section 1206.2(b). Once Board-certified, the union is conclusively presumed for two years to represent the majority. 29 C.F.R. Section 1206.4.

502

pervasive as to preclude any union competing with the company union from gaining the requisite quantum of support, the rival's adherents would be without access to the Board altogether.

With the illumination provided by the foregoing historical development of the Act, we now eye plaintiffs' complaint to determine whether the instant dispute lies within the exclusive jurisdiction of the Board or whether this court may properly take cognizance. This determination involves a judgment as to whether the instant dispute comes within Section 2, Ninth, of the Act, or within Section 2, Third.

Plaintiffs' basic contention is that United, by the very fact of its negotiating with IAM for a new contract, is improperly influencing, interfering and coercing employees in the exercise of their free will, in violation of Section 2, Third, Fourth and Ninth of the Act. The argument goes that "every day the negotiations continue, the 'prestige' of the incumbent union (IAM) is unfairly and unlawfully enhanced and the risk of a pre-election contract settlement that would necessarily shatter chances for a fair election is dangerously magnified." Complaint at p. 2.

Plaintiffs also assert that United's enforcement of its no distribution rule improperly denies AMFA its organization rights guaranteed under those provisions of the Act, and that United's alleged extension of special privileges to IAM supporters unfairly assists that organization to plaintiffs' detriment. The question here is not, of course, whether these allegations are true, but rather whether the National Mediation Board, acting pursuant to its statutory power of Section 2, Ninth, can protect plaintiffs'

rights in the first instance without our judicial intervention.

Plaintiffs advance three arguments in support of this court's jurisdiction. First, they argue that the National Mediation Board is not authorized to resolve alleged "unfair labor practices",[9] and that since some adjudicative body must be so authorized, it must be the federal court. Second, plaintiffs claim that the instant case tracks a case from a sister district court, *Pan American World Airways, Inc. v. Teamsters Union*, 275 F.Supp. 986 (S.D.N.Y.1967), aff'd per curiam sub nom., *Brotherhood of Ry. & S. S. Clerks v. Pan American World Airways, Inc.*, 404 F.2d 938 (2d Cir. 1969), in which jurisdiction was exercised in a case with some characteristics similar to this one. Third, plaintiffs point us to the fact that had this employer been subject to the requirements of the National Labor Relations Act, 29 U.S.C. Sections 151–188, rather than the Railway Labor Act, the National Labor Relations Board would have issued an order prohibiting negotiations between the employer and the incumbent union pending resolution of the representation dispute pursuant to that Board's ruling in Shea Chemical.[10] Since, as plaintiffs correctly point out, the National Mediation Board is not empowered to issue such an order, plaintiffs ask this court to act as the National Labor Relations Board would in such a situation, and order a stop to bargaining negotiations. The court will consider each of these contentions in the order indicated.

■ As to the first of the contentions, it seems to the court that plaintiffs' major premise is faulty. While the National Mediation Board is not empowered to remedy "unfair labor practices" as such,

---

**9.** Here, plaintiffs borrow the language of the National Labor Relations Act, which details, in Section 8, 29 U.S.C. Section 158, certain activities by labor organizations and employers constituting "unfair labor practices", which the National Labor Relations Board is empowered to remedy by Section 10, 29 U.S.C. § 160. There are no analogous provisions under the Railway Labor Act. As noted, the Mediation

Board's powers, granted to it in Section 2, Ninth, of the Act, extend only to insuring a fair and uncoerced election of bargaining representatives.

**10.** See *Shea Chemical Corp.*, 121 NLRB 1027, 42 LRRM 1486 (1958); *NLRB v. Midtown Service Co.*, 425 F.2d 665 (2d Cir. 1970).

Congress has given that Board a great deal of power to regulate such practices indirectly. As has been repeatedly noted, the Act in Section 2, Ninth, charges the Board with the duty to insure that the choice of representatives is made without interference, influence, or coercion exercised by the carrier. Where such practices are found by the Board to have tainted the designation or election process certification of the union benefitting from the taint can (and must) be withheld. The Board will continue to set aside elections tainted by improper influence until such time as the offending practice ceases. Certainly it cannot be said that the Board is powerless to act, notwithstanding that the procedure under the National Labor Relations Act may be in some sense more direct.[11]

Plaintiffs' reliance on the *Pan Am* case, supra, is misplaced. There, the relief requested *by the carrier* was necessary to extract the carrier from between a rock and hard place. The Clerks Union was the incumbent certified bargaining representative of the carrier's employees. As the collective agreement neared an end, the Clerks served upon the carrier written notice of intended change pursuant to Section 6 of the Act. A year before, the Teamsters had filed a representation petition with the NMB pursuant to Section 2, Ninth, claiming the right to represent the clerical employees then represented by the Clerks. The Board had found that a dispute existed and ordered an election. An election was held, but was set aside by the Board on the ground that "fraudulent representations" had created an atmosphere wherein free choice was doubtful.[12] A second election was ordered, held, and again set aside upon the challenge of the Clerks Union. It was at about the time of the scheduled third election that the Clerks served its Section 6 notice. The carrier refused to commence negotiations, contending that to do so in the face of a substantial dispute over representation would violate the Act. The Clerks wrote to the NMB seeking a clarification of the bargaining

**11.** Plaintiffs persistently point to an affidavit of a past executive secretary of the Board, quoted in *Air Line Pilots Assn. v. National Mediation Bd.*, 220 F.Supp. 730, 732 (D.D.C. 1963), in which it was stated that:

It has been the consistent position of the National Mediation Board since its creation under the 1934 Amendment to the Railway Labor Act, that this Board has no legal authority to investigate and pass upon charges of carrier interference, assistance, influence and coercion in connection with representation of carrier employees, except to take the necessary steps to see that the actual election procedure be free from such actions by the carrier.

The exception here may very well swallow up the rule, for, as a practical matter, since the Board must insure a coercion-free election atmosphere, it usually makes a finding concerning illegal influence, which finding is binding on the courts. See *Ruby v. American Airlines, Inc.*, 323 F.2d 248 (2d Cir. 1963). Likely the affiant meant simply that the Mediation Board will not entertain "unfair labor practice" petitions as does the National Labor Relations Board, since its statutory authority extends only to the conduct of elections and the certification of representatives. Additionally, the remedies which flow from the two boards are quite different. The National Labor Relations Board can order the party committing the offending practice to cease doing so, with the compulsion of enforcement in the court of appeals if necessary. On the other hand, the National Mediation Board's only method to deal with improper influence is to set aside the election of the party improperly benefitted and to deny that party certification.

The facts surrounding the giving of that affidavit do not appear in the *Air Line Pilots* case, and thus what the affiant might have meant is sheer speculation. It is to be noted however, that the trial judge stated, immediately following the quoted passage, that: "the proper forum for determination of the issue of carrier interference would appear to be the National Mediation Board". Board counsel asserted that the Board had conducted an "adequate investigation". The court refused, however, to look into its adequacy, noting that even if, in fact, the investigation were inadequate, that would not permit the court to act in an appellate capacity. See also, *Ruby*, supra, at 253–55.

**12.** The opinion does not disclose the source of the fraudulent representations or "elements of campaign trickery" found to invalidate the election. It appears that the violations flowed from the bitter battle being waged between the Clerks and the Teamsters, rather than from any conduct of the employer, who was in all respects consistently neutral throughout.

obligations of Pan Am and the Clerks pending the outcome of the newly-ordered election. The Board's response was, in the view of the court, "to say the least, highly ambiguous." [13] *Pan Am,* supra, 275 F.Supp. at 991. When Pan Am adhered to its position ʷith respect to the illegality of negotiation, the Clerks called a strike. Pan Am thereupon asked the district court for a declaration as to whether it was legally obligated to negotiate and for an injunction against the threatened strike. The relief requested was granted.

The court canvassed the various cases holding that the determination of disputes as to representation of employees under Section 2, Ninth, is one of the important functions committed exclu-

sively to the Board and those holding that the exercise of those functions is not subject to judicial review. The court concluded, however, that "in each of [the cases] judicial intervention [was] barred because it [was] deemed to constitute interference with or usurpation of functions exclusively committed to the Board under § 2, Ninth, of the Act" (*Id.* at 994), whereas the relief sought at bar would not interfere with the Board's exclusive functions, but would, on the contrary, aid in the proper exercise of such functions. This conclusion was premised on the observation that no machinery exists under the language of Section 2, Ninth, whereby a *carrier* could present to the Board for definitive resolution the question posed.[14] That question, stated the court:

---

**13.** The Board's letter, in pertinent part, read as follows:

"During the pendency of this representation case, the certified bargaining agent remains unchanged. The obligations of the carrier toward the bargaining agent, as set forth in Section 2 First of the Railway Act, also remain unchanged."

(Section 2, First, of the Act, 45 U.S.C. § 152, First, requires the carrier to make "every reasonable effort" to make and maintain agreements and to settle all disputes, "in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.")

The Board seems to be saying, and very clearly, that notwithstanding a dispute as to representation, the carrier is bound by its Section 2, First, duty to carry on negotiations with the presently certified representative. The ambiguity arises from the holding of certain courts that the courts will not compel a carrier to bargain with a plaintiff union where there is a real dispute as to which union is the representative of an employee group. See, e. g., *Ruby v. American Airlines, Inc.,* 323 F.2d 248, 255 (2d Cir. 1963); *Flight Eng. Int. Assn. v. Eastern Airlines, Inc.,* 311 F.2d 745, 747 (2d Cir.), cert. denied, 373 U.S. 924, 83 S.Ct. 1523, 10 L.Ed.2d 416 (1963). These two cases, however, rely heavily on *General Committee v. Missouri-K-T-R, supra,* 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943) and the other two cases comprising the "320 U.S trilogy", which merely held that the courts were without jurisdiction to decide which of two *certified* unions, representing different groups of employees, were to represent employees acting in a "hybrid" capacity, that is, performing functions which fell within the scope of representation

of both unions. The question faced in *Ruby* and *Flight Engineers* was quite different; namely, whether the court should compel the carrier to bargain with the previously certified union in the face of a representation dispute between that union and a rival, but as yet uncertified, union.

It *appears* to be the Board's position that the carrier should be so compelled, in apparent disagreement with the two Second Circuit decisions. Given this as yet unresolved question of the carrier's bargaining obligations during a representation dispute, the reliance in *Pan Am,* upon which the plaintiffs here in turn rely, upon *Ruby* and *Flight Engineers* is at the least, suspect.

**14.** The disputes placed under the Board's jurisdiction by Section 2, Ninth, noted the court, are disputes "among [the] carrier's employees as to who are the representatives of such employees." 45 U.S.C. § 152. The Board is required to act "at the request of either party", which the court interpreted to mean at the request of one of the groups of employees involved in the dispute. *Pan Am, supra,* at 994.

We note, however, that the Board's usual practice when a representation petition is filed, is to invite the carrier to submit any statements it cares to make, See, e. g., *Ruby v. American Airlines, Inc.,* 323 F.2d 248, 252 (2d Cir. 1963); also Affidavit of Clark Luther, attached to defendant United's papers in this action, at ¶ 17. See also, 29 C.F.R. 1202.8. This is not to say, of course, that the Board is legally compelled to make a definitive resolution of questions posed by the carrier in these invited statements. It merely shows that the Board has before it on consideration of a represent dispute the viewpoints and concerns of all interested parties.

. . . is not one committed to the Board under the Railway Labor Act and even less one on which the Board is under a duty to render a declaratory ruling. No administrative machinery is provided in the Act for the resolution of this critical question under these circumstances. If the court fails to resolve it either Pan Am is faced with a coercive strike by the Clerks Union, or if it changes its position because of pressure so exerted, it is subject to charges by the rival Teamsters of interference, influence, or coercion in the election. Thus, the long overdue election result might be jeopardized or further delayed. In addition the carrier might be subject to criminal penalties under § 2, Tenth. *Id.* at 995.

Thus the court clearly felt that since the suit before it had been brought by the carrier, the court would be operating outside of the exclusive jurisdiction of the Board. In the instant case, of course, United was satisfied to commence, and did commence, negotiations with IAM. United's only concern was to negotiate a new contract as quickly as possible so as to avoid interruption in its operations. United is not in the posture of Pan Am, which instituted legal action only after requesting but not getting definitive aid from the Board, in the face of a disruptive coercive strike threat.

The court in *Pan Am* was also undoubtedly concerned over the extremely long time delay of over two years which had attended the Board's calling for three different elections. Under the circumstances, the court might well have felt the time for judicial intervention was ripe since the administrative and other processes were clearly not functioning properly to bring the dispute to a timely end. Whereas the court might not have acted in the early stages, the passage of time had created an exigency with which the court felt compelled to deal. This is especially so in light of the

Act's stated purposes "to avoid any interruption to commerce or to the operation of any carrier engaged therein", and "to provide for the prompt and orderly settlement of all disputes." See, 45 U.S.C. Section 151a(1) and (4). See also, *Pan Am,* supra, at 998–99.

In connection with the two foregoing factors which distinguish *Pan Am* from the instant case, we note that the court there repeatedly emphasized that its holding was to be limited to the particular facts and circumstances there present. The court stated:

> The question to be passed on is whether under the *particular facts and circumstances of this case* it is unlawful for Pan Am to negotiate with the Clerks Union regarding a new collective bargaining agreement. It is *not* whether negotiation by a carrier with an incumbent union while representation proceedings are pending is unlawful under any and all circumstances. (Emphasis in the original.) *Pan Am,* supra, at 996. See also, *id.* at 998–99.

Even under these particular facts, giving rise as they did to an exigency demanding some form of relief, the court termed the question of whether the Board had exclusive jurisdiction a "close one". *Id.* at 994.

The absence of these facts in the instant case, we believe, distinguishes it from *Pan Am,* and we do not find the case to provide authority for an assertion of jurisdiction here.

The plaintiffs' third contention is based on an analogy to the National Labor Relations Act (NLRA), under which the National Labor Relations Board has ruled that for an employer to negotiate with the incumbent union, or any union, during the pendency of representation proceedings before the Board constitutes influence, coercion or domination under Sections 8(a)(1) and 8(a)(2) of that Act, 29 U.S.C. § 158(a)(1) and (2).[15] Plaintiffs wish this court to act as the National

---

**15.** See *Shea Chemical Corp.,* 121 NLRB 1027, 42 LRRM 1486 (1958). The rule originated in the NLRB's decision in *Midwest Piping & Sup-*

*ply Co.,* 63 NLRB 1060, 17 LRRM 40 (1947), and is commonly known as the Midwest Piping doctrine. It is unanimously followed by

Labor Relations Board would if this case arose under the legislation it is empowered to implement and hold that an employer's continuing to negotiate in these circumstances is per se a violation of Section 2, Third, or Section 2, Ninth, of the Railway Labor Act.

■■■■ We have a major objection to fulfilling this request: if the analogy is truly a good one, this court would be intruding on the jurisdictional soil upon which the National Mediation Board has been given the exclusive right by Congress to tread. We think the analogy is good insofar as the particular issue at bar is concerned. That is to say, *at least where representation disputes are concerned,* the National Mediation Board has been given complete jurisdiction under the Railway Labor Act, which is coextensive with that of the National Labor Relations Board under the National Labor Relations Act. The jurisdiction of both administrative bodies is exclusive, with no power in the federal district courts to intrude. Both bodies are

empowered to make unit (term "craft or class" under the Railway Labor Act) determinations [16] and to ascertain who is the true representative of the employees and to certify that representative.[17] Certification entitles the representative to exclusive status as bargaining agent, with whom the employer must "treat" [18] or "bargain." [19] In the process of ascertaining who the true representative is, each Board must insure against influence or coercion being brought to bear on the employees' will.[20] The methods used and the remedies the respective boards are authorized to prescribe to mitigate against such unlawful influence or coercion differ significantly.[21] But both Boards have "jurisdiction" over the total process by which bargaining representatives are selected.

■■■■ Given that the NMB has jurisdiction in the area of representation disputes, and is directed to insure that illegal influence does not bear on the outcome of such disputes, it follows that if such a rule as that found in Shea

the courts of appeal. See, e. g., *NLRB v. Midtown Service Co.,* 425 F.2d 665 (2d Cir. 1970); *NLRB v. Downtown Bakery Corp.,* 330 F.2d 921 (6th Cir. 1964); *St. Louis Independent Packing Co. v. NLRB,* 291 F.2d 700 (7th Cir. 1961); *NLRB v. National Container Corp.,* 211 F.2d 525 (2d Cir. 1954).

16. Compare NLRA Section 9(b), 29 U.S.C. § 159(b), with RLA Section 2, Ninth, 45 U.S.C. § 152, Ninth, and 29 C.F.R. § 1202.8.

17. Compare NLRA Section 9(c)(1), 29 U.S.C. § 159(c)(1), with RLA Section 2, Ninth, 45 U.S.C. § 152, Ninth.

18. RLA Section 2, Ninth, 45 U.S.C. § 152, Ninth.

19. NLRA Sections 8(a)(5) and 9(a), 29 U.S.C. §§ 158(a)(5) and 159(a).

20. Compare NLRA Sections 8(a)(1), 8(a)(2), and 8(b)(1), 29 U.S.C. §§ 158(a)(1), 158(a)(2), and 158(b)(1), with RLA § 2, Ninth, 45 U.S.C. § 152, Ninth.

21. The National Labor Relations Board has the power, under NLRA Section 10, 29 U.S.C. § 160, to prevent any person from engaging in any unfair labor practice, as defined in NLRA Section 8, 29 U.S.C. § 158. Employer interference, domination, or coercion constitutes such an unfair practice under NLRA Sections

8(a)(1) and 8(a)(2), 29 U.S.C. §§ 158(a)(1) and 158(a)(2). On receipt of an unfair labor practice petition, the Board has the power to issue to the offending party a complaint which such party has a chance to answer with opportunity for oral hearing. If the Board determines after its investigation and hearing that an unfair labor practice has indeed been committed, it issues an order directing the violator to cease and desist, which is enforceable by Board petition in any court of appeals. The Board's findings with respect to question of fact is supported by substantial evidence on the record are conclusive. An adverse party may also petition a court of appeals for review of the order. See generally NLRA Section 10(a)–10(e), 29 U.S.C. § 160(a)–160(e).

The National Mediation Board, on the other hand, does not have this broad power to investigate unfair labor practice charges, issue complaints and orders, and seek judicial enforcement of its decisions. Rather, its only express statutory power in the area of illegal influence in the course of a representation dispute is found in Section 2, Ninth of the RLA, 45 U.S.C. § 152, Ninth, which requires the Board to insure the choice of representative without influence or coercion. The Board so insures through exercise of its inherent power to set aside an election found to be conducted in a coercive atmosphere.

Chemical is to be promulgated—the purpose of which is to regulate interference with the employees' choice of representative—, it is for the National Mediation Board, and not this court, to do so.[22] As far as this court knows, it may well be a conscious exercise of that Board's unfettered discretion in this area that the Board does *not* have such a rule.[23] It would be usurpation of power of the most flagrant sort for this court to make such a rule and in effect force it on the Board, in light of the clear Congressional intendment that its carefully fashioned administrative machinery was to operate in the area of representation disputes without judicial interference.

The analogy between the NLRA and its administrative arm the NLRB on one hand, and the RLA and the NMB on the other, only goes so far, however, and, beyond the realm of questions of employee representation, may be seriously misleading. The total extent of judicial and administrative jurisdiction granted by Congress under the National Labor Relations Act is much

22. While as plaintiffs point out, the Board does not have authority as does the National Labor Relations Board to issue orders directing carriers to stop negotiating, the NMB does have a rule-making power under which it can regulate the conduct of representation elections. See, e. g., 29 C.F.R. §§ 1202.3, 1205.4, 1206.2, 1206.4, and 1206.8.

23. The Board might well conclude that such a rule suspending negotiations during representation disputes is, in the vast majority of cases, either (1) inadvisable, in view of the disruption in labor relations it might cause, in contravention of the express purpose of the Act to avoid interruption to commerce or the operation of any carrier (see RLA § 1(a), 45 U.S.C. § 151(a), or (2) unnecessary, in view of the fact that the Board is directed (although not mandated) to certify the chosen representative "within thirty days after the receipt of the invocation of its service", see RLA § 2, Ninth, 45 U.S.C. § 152, Ninth. (In connection with the latter, contrast the average time lapse between the filing of a charge and final decision of the National Labor Relations Board, which was 475 days in 1960. Organization and Procedure of the National Labor Relations Board, Report to the Senate Committee on Labor and Public Welfare, S.Doc.No.81, 86th Cong., 2d Sess. (1960) pp. 1–2, cited in *Ruby,* supra, 323 F.2d at 256.)

Intervenor IAM strenuously argues that suspension of negotiations would be very disruptive to operations since the employees' anticipated November 1 wage and benefit increase would not be forthcoming for an indefinite period until an election is completed and a new contract negotiated by the winner. While this type of disruption of necessity occurs whenever the NLRB orders negotiations suspended, disruption in the railroad and airline industries, infused as they are with a great national interest, is to be assiduously avoided. In this connection, compare the National Labor Relations Act, under which the parties are left very quickly following bargaining impasse to their economic weapons of lockout and strike, with the Railway Labor Act, under which Congress has provided for *compulsory* mediation followed by the creation of a Presidential Emergency Board to investigate the dispute, during which the parties may make no changes in conditions out of which the dispute arose. See RLA Section 10, 45 U.S.C. § 160.

This Congressional imperative to avoid disruption in the railroad and airline industries is buttressed by the National Mediation Board's policy of guaranteeing contract continuity between changes in employee representation. Under this policy, the Board "has taken the position that a change in representation does not alter or cancel any existing agreement made in behalf of the employees by their previous representatives. The only effect of a certification by the Board is that the employees have chosen other agents to represent them in dealing with the management under the existing agreement." First Annual Report of the National Mediation Board at 23, cited in *Pan Am,* supra, 275 F.Supp. at 991 n. 6. Contrast the position taken by the National Labor Relations Board that a long-term contract negotiated by the predecessor is not binding on a successor representative, who is entitled to negotiate a new agreement. *American Seating Co.,* 106 NLRB No. 44, 32 LRRM 1439 (1953). From this discussion the conclusion emerges that any rule having the effect of suspending negotiations, with the potential of attendant disruption, should be made on an *ad hoc* basis, by the Board, which has the special expertise to evaluate the disruptive effect under the particular facts and circumstances of the particular case it is faced with. In the instant case, for example, the Board should have the opportunity to consider the possibly disruptive effect of suspending negotiations with respect to the mechanics and related employees craft or class in light of the fact that United must continue expedited negotiations with three other groups represented by IAM (ramp and stores employees, food service employees, and dispatchers) whose contracts are also set to expire on November 1.

greater than the total extent of such jurisdiction granted by Congress under the Railway Labor Act. As the latter act's history shows, and as Judge Friendly has stated:

> The special situation in the railroad industry, where strong unions and management had become used to dealing with each other, differed vitally from the host of problems at which the Wagner Act was aimed—businesses of every size and description, many with a history of strong anti-union bias and with ample opportunity for strong-arm tactics. It was thus natural that the Wagner Act should stress administrative adjudication whereas the earlier Railway Labor Act relied primarily on mediation. For the courts to require the Mediation Board to transform itself into an adjudicative and prosecutorial agency like the N.L.R.B. or to impose themselves upon it would distort the entire Congressional scheme. . . . (A)s to the Railway Labor Act, "The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate." 320 U.S. at 333 [64 S.Ct. at 151, 88 L.Ed. 76] . . . "There was to be no dragging out of the controversy into other tribunals of law." 320 U.S. at 305, 64 S.Ct. at 99, 88 L.Ed. 61. *Ruby,* supra, at 256.

Our view of the Act's history is that what little jurisdiction the district courts have in matters arising under the Act is in extreme cases of rampant employer domination of the labor relations scene such as are exhibited by company union situations.[24] While Congress did expand the total jurisdiction under the Act in 1926 and again in 1934, this increased jurisdiction went to the National Mediation Board and not to the courts. Whatever use that body chooses in its discretion to make of its jurisdiction is of no concern to us. The failure of the NMB to regulate bargaining during a representation dispute as the plaintiffs here might wish does not confer power upon this court to require the Board to act as the NLRB has in so regulating, or to act for it. We do not feel compelled to expand, indeed we feel prohibited from expanding, the limited scope of jurisdiction existing under the Railway Labor Act by analogy to the National Labor Relations Act under which the scope of jurisdiction is much greater.

■ Having concluded that the National Mediation Board has jurisdiction under section 2, Ninth of the Act over the controversy presented here, we need only consider whether we have "concurrent" jurisdiction under section 2, Third of the Act by virtue of the fact that the complaint alleges unlawful interference, influence, or coercion by the carrier.[25] We conclude that we do not in the circumstances of this case, since the allegations of acts of influence by United here, indicating as they do a mere continuation of bargaining, enforcement of a blanket no-distribution rule, and something less than diligence in insuring that IAM people legitimately on United's

---

**24.** In these situations, as noted, it may well be as a practical matter that the courts are the only forums wherein the parties can find relief. See note 8 and accompanying text. In the instant case, however, all interested partes, United, AMFA and IAM, are before the Board on both the craft or class designation issue and the representation issue.

**25.** As noted above, (see notes 5, 8, and 24 and the text accompanying each) the court believes strongly that *if* a matter involving allegations of carrier influence or coercion, no matter how egregious, can be brought before the Board—i.

e., if the interference does not preclude access to the Board because of the requirements of 29 C.F.R. Section 1206.2—then the Board's jurisdiction is exclusive, without concurrent jurisdiction in the federal courts. Stated in the converse, a judicial assertion of jurisdiction is appropriate only in those egregious situations of company unionism which *cannot* reach the Board because of the requirements of 29 C.F.R. Sec. 1206.2. We are not asked here, however, to draw this line, and would reserve for an appropriate case determination of the exact scope of the district courts' jurisdiction under Section 2, Third, of the Act.

property were not soliciting membership in violation of company policy and the collective agreement—these activities, even if assumed true, do not rise to the level of the type of total company domination of the union at which the thrust of judicial intervention under section 2, Third was directed.

For the foregoing reasons, we hold that we are without jurisdiction in this matter, and it is therefore the order of this court that plaintiffs' complaint seeking a permanent injunction be, and hereby is, dismissed, and further that the temporary restraining order issued by this court on September 30, 1975 be, and hereby is, dissolved.