248

Charles H. RUBY, as President of the Air Line Pilots Association, International, and Air Line Pilots Association, International, an unincorporated association, Appellants,

v.

AMERICAN AIRLINES, INC., Appellee,

and

Nicholas J. O'Connell, Jr., individually, and as Chairman of the Master Executive Council of the pilots in the service of American Airlines, Inc., and the Negotiating Committee of said pilots, consisting of Richard Lyons, Robert T. Guba, Joseph Garvey, Paul Atkins and Nicholas J. O'Connell, Jr., ex officio, Additional Appellees.

No. 419, Docket 28417.

United States Court of Appeals Second Circuit.

Argued Sept. 5, 1963.

Decided Sept. 16, 1963.

Henry Weiss (Cohen & Weiss), New York City, (Herbert A. Levy, New York City, of counsel), for appellants.

Arthur M. Wisehart, New York City (George A. Spater, New York City, of counsel), for appellee American Airlines.

Martin C. Seham, New York City, for additional appellees.

Carl Eardley, Morton Hollander and Howard E. Shapiro, Attorneys, Dept. of Justice, Washington, D. C., filed brief amicus curiae on behalf of the National Mediation Bd.

Before CLARK, WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal again raises the problem as to the role of the courts with respect to labor disputes in an industry governed by the Railway Labor Act, 45 U.S.C. §§ 151–188. The Air Line Pilots Association (ALPA), a nationwide union of airline pilots, endeavored in this action to protect its historic status as bargaining representative of American Airlines' pilots, primarily by seeking injunctions that would prevent the defendants—American and a negotiating committee of American pilots which later became the nucleus of a new union—from dealing with one another, and would require American to negotiate with ALPA instead. We affirm the conclusion of the District Court that ALPA made no case warranting judicial intervention in this area, which Congress has so largely committed to the National Mediation Board.

In view of Judge Wyatt's comprehensive statement of the facts we shall limit ourselves to those we deem most important.[1] American Airlines' last pilot contract before the instant dispute was made with the air line pilots in its service "as represented by the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL", which, as the contract recited, "has shown satisfactory proof to the Company of the fact that it represents more than a majority

---

1. Judge Wyatt's opinion also dealt with a related dispute between American and the Flight Engineers' International Association. This is not before us, and we intimate no views in its regard.

of the air line pilots of the Company." The contract was to be effective until July 21, 1960, and was to renew itself annually thereafter unless written notice of intended change was served, pursuant to § 6 of the Railway Labor Act, 45 U.S.C. § 156, at least 60 days prior to July 21 in any year. In March, 1961, American sent such a notice to the president of ALPA, and ALPA sent such a notice to American.

To appreciate the relationship of the parties and the source of the controversy, some understanding of ALPA's structure is required. The basic unit is a Local Council composed of the member pilots of a single airline at an operating base. Certain officers of the Local Councils constitute the airline's Master Executive Council (MEC); this body is "empowered to make the final decision on any problem or problems of the members of that air line, except as provided elsewhere in the Constitution and By-Laws." The Chairman of the MEC is "An ex officio member of the Negotiating Committee." The Negotiating Committee is not otherwise described in the Constitution and By-Laws, but the ALPA Policy Manual says that it shall be selected by the MEC on each airline, and that it "shall have the authority to conclude an agreement subject to the provisions of Article XVIII of the Constitution and By-Laws," which provides that conferences or negotiations to make employment agreements shall not be initiated, carried on, or concluded in the name of ALPA without the prior approval of the Executive Committee or the President, and that no such agreement shall become effective unless signed by the President or some other officer authorized by one of ALPA's central governing bodies. The latter are a Board of Directors containing representatives of all the Local Councils, an Executive Board containing the chairmen and vice-chairmen of all the Master Executive Councils, and an Executive Committee. Thus, while the established procedure is for

an agreement with an airline to be negotiated by a committee of its own pilots, the negotiation takes place under the eye of ALPA's central organization and the agreement is not concluded without the approval of the upper echelon of ALPA's policy makers.

The negotiations that began in 1961 between American and a pilots' negotiating committee, formed in accordance with ALPA policy,[2] were complicated from the outset by the controversy as to cockpit crew complement on jet aircraft which has occasioned a number of disputes and strikes and has been the subject of two decisions of this court. Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n, 306 F.2d 840 (2 Cir., 1962); Flight Engineers' Int'l Ass'n v. Eastern Air Lines, Inc., 311 F.2d 745 (2 Cir., 1963). On October 21, 1961, American notified the ALPA negotiating committee that it accepted the recommendations of a commission, appointed by President Kennedy and chaired by Professor Nathan Feinsinger, that the cockpit crew on jet aircraft should consist of three persons (as desired by the airlines) rather than four; that a flight engineer serving as one of the three should be possessed of a Commercial Pilot's Certificate and Instrument Rating ("C and I") (as desired by ALPA); and that ALPA and the Flight Engineers' International Association should merge, with the job equities of the pilots and engineers reasonably protected. On November 7, 1961, the President of ALPA wrote the National Mediation Board (NMB) that the crew complement problems were "but minor issues on American Airlines" as compared with pilot proposals on retirement and working conditions, notably a reduction of hours. American took the position that it could not grant these if it also had to undergo the expense of training its flight engineers up to the C and I requirement. After mediation by the NMB proved unsuccessful and ALPA declined a suggestion of arbitra-

2. It was customary for an employee of ALPA to attend such meetings as "staff negotiator." Later, in November, 1962, ALPA withdrew its representative from the discussions between American and its pilots.

tion which American had accepted, the NMB, on July 18, 1962, notified the parties that its services had terminated. This left American's pilots free to strike after the lapse of 30 days, 45 U.S.C. § 155 First, unless an Emergency Board were appointed as provided in 45 U.S.C. § 160.

Shortly before this, the Secretary of Labor had achieved a break-through on the problem of cockpit crew complement as to TWA, on the basis of the Feinsinger Commission's recommendations. American's engineers approved these terms but the Company informed the Department of Labor that this settled nothing, since the American pilots had preferred a reduction in hours and other benefits to the four man crew and had recently expressed a preference that American spend its money for such benefits rather than in qualifying flight engineers for the full C and I certificate.[3] During July, 1962, various meetings were held between the Labor Department, Chairman Edwards of the NMB, the Company, the negotiating committee (including the ALPA staff representative), and Ruby who had recently become president of the ALPA. In the course of these, O'Connell, Chairman of the American MEC and one of the pilot negotiators, expressed the preferences of the American pilots along the lines just stated. At later meetings, O'Connell proposed that, if American would grant its pilots reduced hours and an improved retirement plan, they would agree to the three man crew without insisting on the C and I, and would bring the flight engineers into ALPA as the Feinsinger Commission had proposed. Since the pilots' willingness to relinquish the C and I requirement conflicted with what had been ALPA policy, American raised the question whether they could secure an ALPA approving signature; the negotiating committee expressed optimism. During November the Company met with the pilots and the flight engineers jointly; these conferences led to a memorandum of agreement on crew complement, initialed on December 1 by representatives of the three parties, along the lines indicated.

Meanwhile relationships between the pilots' negotiating committee and the ALPA central organization were deteriorating. Since by this time many other major air lines had concluded agreements incorporating the C and I requirement, ALPA objected strenuously to the nonconforming negotiations of the American pilots and sought, both by resolution and by appeal to the NMB, to terminate the American negotiations until the question of crew complement was resolved in writing to its satisfaction. ALPA's efforts did not prevent initialing of the December 1 memorandum but, on December 6, American agreed with Ruby, over the dissent of O'Connell, that negotiations be recessed until January, 1963—apparently for the purpose of giving the ALPA negotiating committee and the ALPA central organization time to work out their differences. Nothing was accomplished. At meetings at ALPA's Chicago headquarters early in January, Ruby and the ALPA Executive Committee remained adamant on the C and I, whereas the American MEC resolved unanimously to authorize the negotiating committee to conclude an agreement without this. On January 11, 1963, Ruby notified the committee and American that no negotiations could occur without his approval. The same day O'Connell requested resumption of negotiations and said that any agreement would be submitted for ratification by American pilots, acting with a 75% vote which, he asserted, could readily be secured. American consulted Chairman Edwards of the NMB; he advised that

---

3.  ALPA's interest in the C and I rating for the third member of the cockpit crew reflected its position that this was desirable for operating reasons, despite less stringent government requirements, and doubtless also a belief that some flight engineers would not qualify for the higher rating, thereby leaving more cockpit positions for the pilots and thus cushioning the impact of the reduction in pilot positions threatened by the introduction of the larger and faster jets.

the company had no choice but to bargain with the committee. Negotiations were resumed on January 16, with the ALPA staff member absent but with a Mediation Board representative always present. Ruby countered with a series of communications apprising all parties of ALPA's view that the negotiations were unauthorized and endeavoring unsuccessfully to initiate a negotiation with the ALPA home office. American asked how a new committee of American pilots could be designated; Ruby had no solution save "bringing the existing committee in or whatever arrangement was necessary." In early February the ALPA Executive Board adopted resolutions declaring that the American MEC and the negotiating committee "are not the bargaining representative of the American Airlines pilots" and directing Ruby or his representative to negotiate and conclude an agreement with American. Efforts by ALPA employees to join the negotiating sessions having proved abortive, it instituted this action, on March 1, 1963, seeking to enjoin American from bargaining with anyone other than the plaintiff. American reached an understanding with its pilots on March 15. The proposed agreements referred to ALPA and provided for signature by it, which could not occur unless ALPA, now confronted with a completed contract, should reverse its previous position.

The break was not long in coming. The American MEC unanimously ratified the March 15 agreements. Ruby, who was invited to some of the sessions, said he would not sign these or any other agreements not containing a C and I requirement for the third man. The MEC thereupon authorized the formation of a new organization, Allied Pilots Association, to represent the American pilots.[4] On April 12, Allied sent out cards which would authorize it to be the collective bargaining representative of the American pilots and to seek certification under § 2 Ninth of the Railway Labor Act, 45 U.S.C. § 152 Ninth. ALPA amended its complaint to include O'Connell and the other members of the negotiating committee as additional defendants. On April 24 Allied filed an application with the NMB, stating that a representation dispute had arisen among American's pilots and asking for an investigation and certification under § 2 Ninth; it claimed to have authorization cards from 1150 out of 1600 pilots.

The NMB promptly invited American and ALPA to submit any statements they cared to make. ALPA called the NMB's attention to this action, and the allegations of assistance, influence and coercion by American made therein. American filed a petition for leave to intervene and a letter giving its version of the facts and denying any improper conduct. On May 24, 1963, the NMB advised that Allied's application had been given a preliminary investigation by a mediator; that the Board, having "reviewed all the information now in its possession", was "of the opinion no issues have been raised which warrant further preliminary proceedings" or deferral of the processing of Allied's application pending the outcome of current litigation; and that it had directed that the application be docketed as Case No. R 3619 and that a mediator be assigned for further handling in accordance with usual procedures.[5] After receipt of further letters from ALPA's attorney, the Board, on June 5, adhered to this position. On June 13, the mediator reported he had found acceptable authorization cards from 84% of the eligible pilots and recommended that a mail ballot election be held. NMB directed that such an election be conducted. This has not occurred due to an action brought by ALPA against the members of the

4. Judge Wyatt found "There is no evidence that the Company suggested, encouraged or even knew in advance about the determination of the American pilots to leave ALPA over the 'C and I' issue and form their own organization."

5. Previously the case had been known as C–3351. We were informed at argument that the "C" Docket contains cases which are the subject of preliminary investigation whereas the "R" Docket is for cases which are thought may be ripe for a representation election.

Board in the District of Columbia wherein the NMB has been stayed from proceeding with the election pending determination in the action now before us.

Allied responded to ALPA's District of Columbia suit by demanding, on June 19, that American recognize it and sign the March 15 agreements. Its letter pointed out that the delays were resulting "in a financial gain to American Airlines" and corresponding detriment to the pilots since "working conditions obviously cannot be made retroactive." A further letter, of July 3, 1963, emphasized and amplified this position, alleging that the proportion of the pilots voting for representation by Allied was now more than 90% and making the pointed suggestion "There is no restriction on the freedom of American's pilots to enforce, by whatever means necessary, their right to be represented by an organization of their own choosing." On July 9, noting "There can be no question but that the overwhelming majority of the pilots have authorized Allied to act as their bargaining representative", American recognized Allied and signed the agreements.

Meanwhile the District Court was taking evidence in this action, the hearing (which included the related claim of the flight engineers) having consumed part or all of 21 court days and the transcript extending over nearly 3200 pages. In opinions dated August 12, 1963, Judge Wyatt denied ALPA's motion for a temporary injunction and directed the summary judgment dismissing the complaint for want of jurisdiction over the subject-matter from which this appeal is taken.

Mere statement of the facts makes it apparent that Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), and the two other cases decided therewith, General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Missouri-K. T. R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943), and General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Southern Pacific Co., 320 U.S. 338, 64 S. Ct. 142, 88 L.Ed. 85 (1943), constitute a formidable obstacle to the maintenance of this action. The Switchmen's case [6] held that a district court was without jurisdiction to cancel a certification by the NMB, under § 2 Ninth, that a particular union was the duly designated representative of certain employees, with whom "the carrier shall treat". Any attempt to distinguish the Switchmen's case on the basis that there has as yet been no certification of Allied runs counter to the consideration that a suit to review administrative action usually stands on a better footing than one whose maintenance would prevent an administrative agency from performing its statutory duty.[7] Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938) ; Macauley v. Waterman S. S. Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946). ALPA relies primarily on another basis of distinction, namely, that the trilogy in 320 U.S. related to jurisdictional disputes between unions rather than, as here, to action by an employer alleged to violate various commands of the Act, notably the mandate of § 2 Fourth that an employer shall not "influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization * * *." Its two step argument is, *first,* that, by offering economic inducements to cause its pilots to desert ALPA for Allied, American was guilty of the sort of conduct held to constitute an unfair labor practice under

6. This has been termed "Much the most important case holding that a statute implicitly precluded review," 4 Davis, Administrative Law Treatise 42 (1958). It is criticized by Davis and also by Jaffe, The Right to Judicial Review, 71 Harv. L.Rev. 401, 428–31 (1958).

7. If, as is at least theoretically possible, the vote of the American pilots should favor ALPA rather than Allied, the decree sought would be unnecessary—save perhaps for the limited purpose of cancelling a contract made with a representative which turned out not to be one "duly designated." Compare American Seating Co., 106 NLRB 250 (1953).

the National Labor Relations Act in Medo Photo Supply Corp. v. N. L. R. B., 321 U. S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944), and like cases, and, *second,* that since the Railway Labor Act affords no such opportunity as the National Labor Relations Act for a full administrative hearing and determination, which would result in disqualifying a union found to have benefitted from unlawful conduct by the employer,[8] the federal courts should fill the supposed statutory vacuum.

■■■ We would be unable to take the first step in the argument if that issue required resolution. Whether or not we would have been obliged to sustain an administrative determination that American had violated the statute if one had been made, we would not make any such finding on our own account—must less set aside the District Judge's contrary one. The case differs essentially from Medo. Although the pilots' proposal to forego the C and I requirement in return for economic benefits was doubtless to American's liking, the offer came from the ALPA negotiating committee, and did so at a time when, as American was told, there was still basis for hope that the central organization would go along. American never conditioned its willingness to grant economic benefits upon the pilots' withdrawing from ALPA; on the contrary, a solution leaving them in ALPA would have facilitated merger of the flight engineers into that organization and an amicable disposition of the entire controversy. Rather than refusing to deal with the union's bargaining representative and negotiating with the employees directly, as the employer did in Medo, American dealt for months with the very group with which ALPA's Constitution and By-Laws and Policy Manual told it to deal; and when an impasse developed through ALPA's refusal to accept the results of the negotiation, a refusal wholly within its rights, ALPA was unable to supply a substitute negotiating committee that accorded with past practice and its own Policy Manual. American recognized Allied only when possessed of substantial evidence that Allied represented an overwhelming proportion of its pilots and when threatened with a strike if it refused recognition. Under such circumstances recognition by an employer who has not been guilty of a relevant unfair labor practice need not await certification, although he acts at peril of being right; the facts are far closer to those in N. L. R. B. v. Indianapolis Newspapers, Inc., 210 F.2d 501 (7 Cir., 1954), cited in United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 72 fn. 8, 76 S.Ct. 559, 100 L.Ed. 941 (1956), and in District 50, United Mine Workers v. N. L. R. B., 234 F.2d 565 (4 Cir., 1956), than to those in Medo. Compare N. L. R. B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 719 (2 Cir., 1961).

■■ However, we need not decide this issue since we find that the distinction of the Switchmen's case asserted by ALPA is not legally sufficient on the facts here. In both cases the basic claim is of unlawful deprivation of the important rights to representation guaranteed by § 2—in the Switchmen's case by the Board's allegedly unlawful selection of a bargaining unit, here by the Board's allegedly unlawful condonation of illegal tactics by American. It was obvious almost from the beginning of this action that it concerned the proper representation of American's pilots, a subject which Congress has given the Mediation Board the duty to determine.

■■ Appellants seek to bring themselves within two areas heretofore recognized as appropriate for judicial intervention in Railway Labor Act matters— the duty of the courts to require the carrier to bargain with the duly designated representative, Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57

---

8. When a charge of such a practice, having *prima facie* merit, is filed before a representation election, the NLRB will customarily postpone the election until it has passed upon the charge. See Sur-

prenant Mfg. Co. v. Alpert, 318 F.2d 396, 397 (1 Cir., 1963), citing United States Coal & Coke Co., 3 NLRB 398 (1937), and the NLRB's Third Annual Report (1939) 143.

S.Ct. 592, 81 L.Ed. 789 (1937), and, very likely, when necessary, a duty to require the Mediation Board to do what Congress commanded, namely, to investigate and certify—the point reserved by the Supreme Court in the M. K. T. case, 320 U.S. at 336 fn. 12, 64 S.Ct. at 152, 88 L.Ed. 76; cf. Order of Railway Conductors v. Pennsylvania R. Co., 323 U.S. 166, 65 S.Ct. 222, 89 L.Ed. 154 (1944), and decided in Air Line Dispatchers Ass'n v. National Mediation Board, 89 U.S.App. D.C. 24, 189 F.2d 685, cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951). The case does not fall within the first of these principles. For, even though we accept appellants' argument that, in the light of § 2 Second, Fourth and Sixth, it is not fatal that ALPA never had been certified so as to come within the precise command of § 2 Ninth that the employer "treat with the representative so certified", the courts cannot properly require an employer to bargain with a previously designated representative in the face of a substantial representation dispute requiring the intervention of the Mediation Board under § 2 Ninth—a development which became an almost inevitable prospect within a few weeks after this action was brought on March 1 and crystallized into a certainty by late April.

■■ Appellants have likewise failed to make a case for invoking the second possible judicial role. The Board's duty to investigate is a duty to make such investigation as the nature of the case demands. See WES Chapter Flight Engineers' Int'l Ass'n v. National Mediation Board, 114 U.S.App.D.C. 229, 314 F.2d 234, 237 (1962), a decision which weighs heavily against ALPA's entire claim.[9] We are not required to decide whether relief for failure of the Board to make a proper investigation could ever be granted in an action to which the Board is not a party. For the record shows that the Board performed its duty. True, no testimony was taken, as it was in the WES case, but the Board's manner of investigation was not only as good but better under the circumstances. As we are told by an affidavit of its Assistant Executive Secretary, it utilized pleadings, exhibits, and portions of the record already made in this action, which each of the three members reviewed. In addition it had the important benefit of its own intimate knowledge of the negotiations, derived from the participation of its representatives therein. ALPA has told us of no additional material facts it would have presented if the Board had given it a further opportunity; its complaint relates not so much to the adequacy of the information before the Board as to the Board's conclusion that no wrong had been done. We see no more basis for judicial interference with that conclusion than with the conclusion in the Switchmen's case that the New York Central's yardmen should vote on a system-wide basis. See 320 U.S. at 301, 305, 64 S.Ct. at 97, 99, 88 L.Ed. 61. Compare General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Missouri-K.T.R. Co., supra, 320 U.S. at 337, 64 S.Ct. at 152, 88 L.Ed. 76; Brotherhood of Railway and Steamship Clerks v. United Transport Service Employees, 320 U.S. 715, 64 S.Ct. 260, 88 L.Ed. 420 (1943), reversing per curiam 78 U.S.App. D.C. 125, 137 F.2d 817 (1943); UNA Chapter, Flight Engineers' Int'l Ass'n v. National Mediation Board, 111 U.S.App. D.C. 121, 294 F.2d 905 (1961), cert. denied, 368 U.S. 956, 82 S.Ct. 394, 7 L.Ed. 2d 388 (1962); Air Line Stewards and Stewardesses Ass'n v. National Mediation Board, 111 U.S.App.D.C. 126, 294 F.2d 910 (1961), cert. denied, 369 U.S. 810, 82 S.Ct. 687, 7 L.Ed.2d 611 (1962); Flight Engineers' Int'l Ass'n v. Eastern Air Lines, Inc., supra, 311 F.2d 745.

■ ALPA persistently reminds us how differently the case would have been treated if American had been a bus line subject to the National Labor Relations Act rather than an airline subject to the

---

9. For reasons indicated above, we find no merit in ALPA's distinction of the WES case on the basis that there the suit followed whereas here it preceded certification.

Railway Labor Act.[10] But the claim that the courts should do under the Railway Labor Act what Congress directed the NLRB to do under the National Labor Relations Act not only flies in the face of the difference in the language and scheme of the two statutes but ignores the diverse problems to which they were addressed. The Railway Labor Act constituted "legislation agreed upon between the railroads and the Brotherhoods and probably unique in having been frankly accepted as such by the President and Congress * * * [E]very stage in the evolution of this railroad labor code was progressively infused with the purpose of securing self-adjustment between the effectively organized railroads and the equally effective railroad unions * * *." Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 752–753, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (dissenting opinion of Mr. Justice Frankfurter). The special situation in the railroad industry, where strong unions and management had become used to dealing with each other, differed vitally from the host of problems at which the Wagner Act was aimed—businesses of every size and description, many with a history of strong anti-union bias and with ample opportunity for strong-arm tactics. It was thus natural that the Wagner Act should stress administrative adjudication whereas the earlier Railway Labor Act relied primarily on mediation. For the courts to require the Mediation Board to transform itself into an adjudicative and prosecutorial agency like the N.L.R.B. or to impose themselves upon it would distort the entire Congressional scheme. Moreover, Congress evidently considered the railroad and, later, the air transport industry to be so heavily charged with public interest as to make speed in the disposition of disputed questions of representation peculiarly vital. The thirty day period which Congress gave the Mediation Board to investigate and certify under § 2 Ninth is to be contrasted with the 475 days reported a few years ago to be the average time lapse between the filing of a charge and final decision of the NLRB, Organization and Procedure of the National Labor Relations Board, Report to the Senate Committee on Labor and Public Welfare, S.Doc. No. 81, 86th Cong. 2d Sess. (1960), pp. 1–2, and with the nearly six months which were here required for full hearings, briefing and decision by an effective judge in the District Court. Considerations such as these, and others marshalled in the opinions in the Switchmen's and M. K. T. cases, underlay the Court's conclusion that, as to the Railway Labor Act, "The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate." 320 U.S. at 333, 64 S. Ct. at 151, 88 L.Ed. 76; see also 320 U.S. at 302, 64 S.Ct. at 97, 88 L.Ed. 61. "There was to be no dragging out of the controversy into other tribunals of law." 320 U.S. at 305, 64 S.Ct. at 99, 88 L.Ed. 61. Contrast Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

■■■■■ Appellants argue that if the District Court had "jurisdiction" when the suit was filed in March, before Allied even existed, this could not have been lost because the Mediation Board concluded in May that there was a representation dispute between ALPA and Allied and that the latter was not disqualified. But it had become apparent, long before Allied's application to the Mediation Board, that this action was subject to the vice that it sought orders from a federal court that might frustrate ultimate determination by the agency to which Congress gave exclusive responsibility; the action should have been dismissed as soon as this appeared. See Division No. 14, Order of Railroad Telegraphers v. Leighty, 298 F.2d 17 (4 Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962). The obstacle in a case like this is not truly lack of "jurisdiction" in the basic sense of a lack of power in the court "to determine whether

10. It is, however, by no means clear that the National Labor Relations Board

would have found *prima facie* merit in ALPA's complaint. See note 8 supra.

it [the claim] was or was not well founded in law and in fact," Lauritzen v. Larsen, 345 U.S. 571, 575, 73 S.Ct. 921, 924, 97 L.Ed. 1254 (1953); rather, as Mr. Justice Jackson there went on to explain, "As frequently happens, a contention that there is some barrier to granting plaintiff's claim is cast in terms of an exception to jurisdiction of subject matter." Compare Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Whether such a "barrier" is apparent the very instant that suit is brought or becomes so later, the court is bound to dismiss.[11]

Affirmed.

11. In view of this conclusion, it is unnecessary to consider appellees' contentions that injunctive relief was barred by §§ 7 and 8 of the Norris-LaGuardia Act, 29 U.S.C. §§ 107, 108.