LOCAL 732, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Plaintiff,

and

Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, Allied Services Division, AFL–CIO, 6300 River Road, Rosemont, Illinois 60018, Intervening Plaintiff,

v.

NATIONAL MEDIATION BOARD, Defendant,

and

Police Benevolent Association, Long Island Railroad Police, Inc., Intervening Defendant.

No. 77 Civ. 4632.

United States District Court, S. D. New York.

Oct. 12, 1977.

Herbert K. Lippman, New York City, for plaintiff.

John O'B. Clarke, Jr., Highsaw, Mahoney & Friedman, Washington, D. C., Paul Reilly, Jr., Reilly, Fleming & Reilly, New York City, for intervening plaintiff; William J. Donlon, Gen. Counsel, Brotherhood of Railway & Airline Clerks, Rosemont, Ill., of counsel.

Robert T. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendant; William G. Ballaine, and Richard J. Weisberg, Asst. U. S. Attys., New York City, of counsel.

Hartman, Morganstern & Lerner, Mineola, N. Y., for intervening defendant; Lawrence M. Gordon, Mineola, N. Y., of counsel.

## OPINION

FRANKEL, District Judge.

This case arises out of a dispute among various labor organizations as to which should be designated under the procedures of the Railway Labor Act, 45 U.S.C. §§ 151–188, to represent police officers employed by the National Railroad Passenger Corporation ("Amtrak"). Plaintiff, Local

732, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT"), seeks a preliminary injunction restraining the defendant National Mediation Board ("NMB") from proceeding with an election ordered pursuant to Section 2, Ninth, Railway Labor Act, 45 U.S.C. § 152, Ninth, to resolve the representation dispute. A temporary restraining order issued September 20, 1977, the day before the ballots were scheduled to be mailed to the affected employees, was vacated on September 21, 1977. At that time, the court granted the motions of the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes, Allied Services Division, AFL–CIO ("BRAC"), to intervene as a party plaintiff and to join in IBT's motion for a preliminary injunction. Another labor organization, the Police Benevolent Association, Long Island Railroad Police, Inc. ("PBA"), has since been granted leave to intervene as a party defendant. The court now finds that the preliminary injunction must be denied.

### I.

The facts, not substantially disputed, are as follows:

Effective January 2, 1974, Congress enacted the Regional Rail Reorganization Act of 1973 ("3R") (P.L. 93–236), 45 U.S.C. §§ 701–94, to provide for the continuation and improvement of rail service in the midwest and northeast United States. The statute provided for the establishment of a commercial entity known as Consolidated Rail Corporation ("ConRail") and for the employment of personnel of railroads whose properties were transferred to ConRail. Following a representation election, the NMB certified IBT as the representative of the class or craft of police officers below the rank of captain on the ConRail system.

By the terms of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4R") (P.L. 94–210), 45 U.S.C. §§ 801–54,

which amended the 1973 legislation, Amtrak acquired certain railway properties known as the Northeast Corridor, previously operated by ConRail, and initiated arrangements for the transfer of ConRail police officers to Amtrak in order to staff the new properties. Under Section 504(f) of 3R, as amended, 45 U.S.C. § 774(f), agreements governing the transfer of ConRail personnel to Amtrak were to be negotiated among ConRail, Amtrak, and the representatives of the various crafts or classes of employees associated with the transferred properties. Prior to the implementation of such agreements, however, Amtrak was obliged to enter into collective bargaining negotiations with the representatives of the crafts or classes of ConRail employees designated to be transferred. Pursuant to this requirement, Amtrak participated in negotiations with plaintiff IBT, and on August 12, 1976, executed an "interim agreement" with IBT governing the rates of pay, rules, and working conditions of police officers transferred to and/or employed by Amtrak in the Northeast Corridor.[1]

When the Amtrak–IBT interim agreement was concluded, Amtrak police officers were represented by plaintiff-intervenor BRAC in accordance with a collective bargaining agreement effective February 1, 1976. In January, 1977, Amtrak's Director of Labor Relations informed the NMB that the carrier's collective bargaining agreements with both BRAC and IBT were still in effect, the three parties having agreed that BRAC would continue to represent the police officers outside the Northeast Corridor, and IBT the police officers within the Corridor. Representatives of IBT and BRAC confirmed the existence of such a BRAC–IBT–Amtrak agreement. Thus, as the Board found in May, 1977, "at the present time Amtrak police officers are uncontestably in the posture of being represented by two labor organizations administering separate collective bargaining agreements on the Amtrak system."

---

1. Under Section 504(f)(2) of 3R, as amended, if no agreement had been reached within 60 days of the commencement of negotiations between

IBT and Amtrak, IBT's agreement with ConRail would have applied to the transferred employees.

On December 31, 1976, the Amtrak Police Association ("APA"), a third labor organization, filed an application under Section 2, Ninth, of the Railway Labor Act alleging the existence of a representation dispute involving Amtrak police officers below the rank of captain. In a hearing before the Board on March 4, 1977, in which all interested parties appeared, the APA took the position that police officers employed within Amtrak's Northeast Corridor properties constituted a separate craft or class. APA went on to urge, however, that if the Board should determine that the craft or class extended beyond the Northeast Corridor segment, the employees in question should be covered by NMB Rules § 1206.2(b), which requires a showing of interest by at least 35% of the affected employees before the Board will "authorize an election or otherwise determine the representation desires of the employees under the provisions of Section 2, Ninth, of the Railway Labor Act." 29 C.F.R. § 1206.2(b) (1976). Representatives of IBT, BRAC, and Amtrak maintained that all police officers employed on the Amtrak system constitute a single class or craft.[2] In addition, BRAC and Amtrak argued that an election, if permitted, would be warranted only upon a showing of interest from a majority of the members of the class or craft under NMB Rules § 1206.2(a), which applies "[w]here the employees involved in a representation dispute

are represented by an individual or labor organization * * * and are covered by a valid existing contract between such representative and the carrier * * *." 29 C.F.R. § 1206.2(a) (1976).[3]

In findings issued May 20, 1977, the Board determined that the carrier's police officers below the rank of captain constituted a single system-wide class or craft, and that the Board would be justified in proceeding with its investigation upon a showing of interest by a majority of the affected employees. The federal mediator assigned to the case had previously set February 17, 1977, as the cut-off date for the submission of authorization cards in support of the APA's application to the Board. Considering all the facts and circumstances, however, the Board determined that insufficient information had been available to the APA to ascertain the showing of interest requirement applicable to its petition, and therefore afforded the applicant ten additional calendar days from the issuance of the findings to submit the necessary authorizations. After timely delivery of additional authorization cards by the APA, the Board formally determined the existence of a representation dispute on May 31, 1977, and authorized a mail ballot election. It also ruled that defendant-intervenor PBA, also an intervenor in the proceedings before the Board, had documented a sufficient

2. The carrier, though not a party to the Board proceeding, furnished information and argument at the invitation of the Board.

3. BRAC, IBT, and Amtrak also contended at the March 4 hearing that the Board was for various reasons without jurisdiction to entertain a representation dispute covering the Con-Rail employees transferred to Amtrak, including the subject police officers. The carrier asserted that the Board's duty under the Railway Labor Act to investigate representation disputes concerning railroad employees was preempted by 4R with respect to employees within the Northeast Corridor properties, and therefore that the Board lacked authority to determine the initial collective bargaining representative of the police officers involved herein. BRAC argued that pursuant to Congress's intent to "provide a mandatory period of status quo" as to the representation of employees transferred to Amtrak, 4R "effectively conferred certification status for the purposes of

the Railway Labor Act on the collective bargaining representative in place" at the time of the 1976 acquisitions, unchallengeable for a "reasonable period," which BRAC suggested to be the two-year certification bar period currently provided for under NMB Rules § 1206.-4(a), 29 C.F.R. § 1206.4(a) (1976). IBT took the position that 4R effectively certified it to be the initial representative of Amtrak police officers in the Northeast Corridor segment, and hence the Board should decline to accept applications for the investigation of alleged representation disputes for a two-year period commencing October 1, 1976, the date Amtrak assumed Northeast Corridor police services.

Based upon what appears to be a reasonable interpretation of the language and legislative history of the 1976 amendments, the Board rejected all of these contentions, and they have been abandoned by their respective proponents in the subsequent proceedings in this case.

showing of interest to appear on the ballot along with APA, IBT, and BRAC.

In the four months and more since an election was ordered, IBT and BRAC have raised numerous substantive and procedural objections to the Board's investigation of this dispute and to its rulings concerning the form and content of the ballot. The election was initially scheduled to occur in early June, but was postponed after plaintiffs gave notice of their intent to submit written protests. Their grievances were set forth in a series of letters to the mediator during the month of June. In a ruling dated July 22, 1977, the mediator rejected all of plaintiffs' contentions, and rescheduled the election for July 27. Plaintiffs' then filed separate appeals, and the election was again postponed pending NMB review of the mediator's findings. The Board denied the appeal on August 12, 1977, in a decision which constitutes the subject matter of the instant action. Approximately one month later, it notified the parties that the ballots would be mailed on Wednesday, September 21.[4]

Five days before the scheduled mailing, plaintiff IBT sent a telex to the Board demanding another postponement of the election for reasons not raised at any earlier stage of the proceedings and unrelated to the claims presented here.[5] When this was denied, IBT brought its grievances to this court, obtaining a temporary restraining order less than 24 hours before the election was to begin. As noted above, the order was vacated on motion of the NMB, and the ballots have been mailed. The procedure designed for resolving this representation dispute—a secret ballot vote by the affected employees—has thus commenced, after long delay; the question is whether it is to be completed.

4. It appears that the time lag between the Board's decision on appeal and its announcement of the date for the commencement of the election was attributable to a ruling that IBT and BRAC could appear on the ballot as "joint council" upon timely submission of specified proof of the existence of a joint council, a showing of interest from 35% of the employees eligible to participate in the election, and disclaimers of interest from IBT and BRAC individually in favor of the joint council. The

## II.

Of the various grievances asserted in the course of the extended proceedings before the NMB, plaintiffs have urged three here. First, they protest that the ten-day extension granted the APA to obtain authorization cards in support of its application violated the NMB's rules and past practice. Second, based upon certain documentary evidence discussed below, they claim that the additional authorization cards submitted by the APA were fraudulently procured through a conspiracy between that organization and defendant-intervenor PBA. Finally, plaintiffs maintain that the PBA is ineligible on two or three grounds to appear on the ballot in this election: (a) IBT asserts that the PBA is not qualified to represent Amtrak employees by reason of certain provisions in its certificate of incorporation and bylaws allegedly limiting the PBA to representation of police officers employed by the Long Island Railroad. (b) The BRAC has questioned whether Amtrak police officers are eligible to join the PBA at all; its primary contention, however, is that PBA must be excluded from participation in the election because even if it admits Amtrak officers to membership, its constitution and bylaws must be read to restrict the rights of these officers to participate in the internal affairs of PBA in violation of Title I of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 401–531.

For reasons that will appear, none of plaintiffs' objections is substantial; i. e., there is not a bright prospect that they could succeed on the merits. But prior to this weighty ground opposing a preliminary

Board presumably found these requirements to be satisfied, since plaintiffs appear as joint council on the ballots in the election sought to be enjoined.

5. Briefly, IBT asserted that the election should be delayed pending resolution of a controversy concerning a recent promotional examination, which is currently being litigated in the Federal District Court in Philadelphia.

injunction, there is grave doubt that this court has jurisdiction to entertain plaintiffs' claims at all. Under controlling precedents, the federal courts are almost totally without power to interfere with NMB decisions in representation disputes; Congress has in the Railway Labor Act committed such controversies to the Board for final determination. *Switchmen's Union v. NMB,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *Brotherhood of Ry. & S. S. Clerks v. Association for the Benefit of Non-Contract Employees,* 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965) (*"ABNE"*). The substantially total prohibition against judicial involvement serves the public interest in expeditious resolution of representation questions affecting common carrier employees, a result essential to industrial peace and hence to the maintenance of uninterrupted service by these instrumentalities of interstate commerce. *Ruby v. American Airlines, Inc.,* 323 F.2d 248 (2d Cir. 1963), cert. denied, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964); *WES Chapter, Flight Engs. Int'l Assn. v. NMB,* 114 U.S.App.D.C. 229, 314 F.2d 234 (1962). We are instructed that Congress intended almost every representation dispute handled by the NMB "to reach its last terminal point when the administrative finding [is] made," and not be "drag[ged] out * * * into other tribunals of law." *Switchmen's Union, supra,* 320 U.S. at 305, 64 S.Ct. at 99.

 If a narrow space remains for judicial involvement, it is open only for "instances of constitutional dimension or gross violation of the statute," *International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S. S. Clerks,* 131 U.S.App.D.C. 55, 64, 402 F.2d 196, 205, cert. denied *sub nom. Brotherhood of Ry., Airline & S. S. Clerks v. NMB,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968), not for cases where the NMB has allegedly made "incorrect" decisions, *Switchmen's Union, supra; Ruby v. American Airlines, Inc., supra.* At least partially accepting this restricted view of the court's role, plaintiffs contend not merely that the

NMB erred, but that it disposed of their objections in disregard of its duties under Section 2, Ninth, of the Railway Labor Act. In thus framing their complaint, they invite the exercise of our jurisdiction under the doctrine of *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958)—a doctrine which, the Supreme Court has reminded us, is not an exception to the bar against direct review of decisions by the NMB within its statutory authority, but rather a narrow authorization to set aside Board orders made "in excess of its delegated powers and contrary to a specific prohibition of the Act." *ABNE, supra,* 380 U.S. at 660, 85 S.Ct. at 1197; *Leedom v. Kyne, supra,* 358 U.S. at 188, 79 S.Ct. 180. Steadily reaffirmed, the rule forbids the court's interference or revision unless an NMB determination is "so plainly beyond the bounds of the Act, or * * * so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S. S. Clerks, supra,* 131 U.S.App.D.C. at 64, 402 F.2d at 205. Cf. *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *United Federation of College Teachers, Local 1460 v. Miller,* 479 F.2d 1074 (2d Cir. 1973); *McCulloch v. Libbey-Owens Ford Glass Co.,* 131 U.S.App.D.C. 190, 403 F.2d 916 (1968), cert. denied, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969); *Rock-Hill-Uris, Inc. v. McLeod,* 236 F.Supp. 395 (S.D.N.Y.1964), aff'd per curiam, 344 F.2d 697 (2d Cir. 1965). With these severe restrictions in mind, we turn to an examination of plaintiffs' claims.

### III.

Plaintiffs contend that the ten additional days granted the APA to submit authorization cards supporting its application violated a customary NMB practice of refusing to accept such cards after the cut-off date announced by the mediator. There is some support for plaintiffs' description of a usual practice.[6] There is also, however, a thor-

---

**6.** *Matter of Representation of Employees of Alitalia,* NMB Case No. R–4608 (July 21, 1976); cf. *Matter of Application of Int'l Bhd. of Team-* *sters, Airline Div., Involving Employees of Northwest Airlines, Inc.,* NMB Case No. R–4569 (Jan. 29, 1976).

oughly persuasive showing that this extraordinary case justified the course followed by the NMB in moving toward the paramount goal of giving employees a full, free, and effective choice of representative.

■ Under Section 2, Ninth, of the Railway Labor Act, the NMB is empowered to "investigate" representation disputes on the request of a party to such a dispute. In furtherance of its investigation, it is authorized "to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives * * *." 45 U.S.C. § 152, Ninth. If the Board determines to conduct an election, it is to "designate who may participate in the election and establish the rules to govern the election * * *." Id. Beyond these very general directives, the statute specifies no particular procedures or guidelines governing the Board's investigation. It "leaves the details to the broad discretion of the Board with only the *caveat* that it 'insure' freedom from carrier interference." *ABNE, supra,* 380 U.S. at 668–69, 85 S.Ct. at 1202.

■ The authority conferred on the Board by Section 2, Ninth, surely encompasses broad discretion to decide when a showing of interest warranting a representation election has been made in the circumstances of a particular docket. Plaintiffs' objection to the NMB's ruling on this point is far removed from the demonstration of administrative action clearly in excess of delegated authority contemplated by *Leedom v. Kyne, supra.* Not only have plaintiffs failed to establish a violation of a specific and mandatory provision of the Act; they have also failed to allege a departure from the NMB's published rules, which set forth the percentage of authorizations required to determine the existence of representation disputes in particular classes of cases, but do not specify when the requisite showing of interest must be made. 29 C.F.R. § 1206 (1976). The conclusion that the court lacks jurisdiction to consider this asserted grievance seems inescapable. Cf. *Ertel Mfg. Co. v. Little,* 52 Lab.Cas. (CCH) ¶ 16,569 (S.D.Ind.1965).

■ We note, however, that if the court were to reach the substance of plaintiffs' claim, we would find it without merit. If there was any departure from customary practice in this case, characterized by the mediator as an "unusual and unique dispute," the Board's explanation was adequate. Given the anomalous status conferred on IBT under 3R, as amended, and the IBT–Amtrak "interim agreement" executed pursuant thereto, and keeping in mind the further ambiguity introduced by the oral BRAC–IBT–Amtrak dual representation agreement concluded thereafter, there was substantial room for confusion on the part of a challenging union as to which showing of interest rule would be applied to a petition for NMB investigation. It was reasonable for the Board to opine that the APA had had some difficulty divining the import of the recent rail legislation without the assistance of a ruling from the agency. It was equally reasonable to conclude that an extension of time for submission of authorization cards after such guidance was provided would further the objective of ascertaining the representation desires of the employees involved. Plaintiffs have failed to substantiate the charge of "arbitrary and discriminatory" administrative action alleged in intervenor BRAC's complaint.

### IV.

Plaintiffs next assert that the NMB violated its duty properly to investigate this representation dispute because it refused to explore the charge, initially proffered by the IBT on June 24, that the cards submitted by the APA after May 20, 1977, were "fraudulently" procured. The word "fraud" is much used in the papers, but it turns out to be misconceived hyperbole to describe a couple of unconcealed actions

that the Board could and did brush aside as alleged barriers to the secret election for choice of representatives.

The argument in this aspect is founded upon two documents: First, a letter from the APA's counsel transmitting to the PBA a supply of authorization cards in the form approved by the mediator, and urging the PBA to obtain from its members the number of additional signed cards calculated to be necessary under the Board's May 20 ruling to obtain a representation election. Second, a newsletter dated June 4, 1977, in which PBA President Michael Matthaei announced to his membership that the election had been ordered "solely because of the help that our organization gave to the applicant" after APA "came to our organization with its tail between its legs and asked for our help to get on the ballot * * *." According to plaintiffs, these communications constitute proof of collusion between the challenging unions to mislead their members and to obtain additional authorization cards "by trick and device," at least sufficient to have warranted a hearing before the NMB on the practices alleged.

It may be said that the Board's responses to these allegations were not as illuminating as they might have been. In his July 22 ruling, the mediator simply declared that the claim of fraud was "inappropriate to this proceeding." On review, the full Board added the conclusion that the objection was "not sufficiently material" to justify reversing the election order, since a secret ballot would afford the affected employees "the best available means of expressing their desires regarding collective bargaining representation," and the authorization card practices alleged would not interfere with their freedom of choice.

 In any event, under the jurisdictional principles reviewed earlier, these circumstances afford no basis for intervention by the court. No case was made for further "investigation" by the Board. The dealings between the APA and the PBA were publicized and known to the NMB. Plaintiffs did not and do not suggest any concrete lines of factual inquiry they would have sought to pursue on this subject. There is no substantial claim of NMB violation of the duty meaningfully "to investigate."

 If the "merits" were reached, no different result would follow. If somewhat cryptically announced, the Board's conclusion was that plaintiffs' claim disclosed no practice which would distort or otherwise invalidate the process most likely to reveal the true preferences of the employees, i. e., a secret ballot election. As this is written, that ultimate objective is nearing attainment. Nothing in the preliminary dealings between the PBA and the APA must be deemed to have required the Board to postpone further or to preclude altogether this ultimately desirable resolution.

### V.

Plaintiffs' last group of objections concerns the NMB's decision to permit defendant-intervenor PBA to appear on the ballot in the election. As noted above, there has been some disagreement as to whether the PBA's articles of incorporation, constitution and bylaws qualify the organization to represent Amtrak employees for the purposes of the Railway Labor Act.

 It appears that the PBA's initial certificate of incorporation, filed in 1971, stated the purpose of the organization "to create, promote and foster good fellowship and friendly relations *among police officers of the Long Island Railroad*" (emphasis added). The italicized language has prompted the IBT to contend that the charter bars the PBA from undertaking the representation of employees of other carriers. The record shows, however, that PBA's counsel submitted to the mediator proof of amendments to the certificate deleting the reference to a specific carrier, and inserting an expanded "purposes" clause which sets forth the organization's objectives with respect to representation of

its "members." This proof was accompanied by documents showing proper execution and filing of the amendments. Evidently relying on these submissions, the Board found that the PBA's current articles of incorporation do not preclude the PBA from representing employees of Amtrak for purposes of the Railway Labor Act, a finding the court is neither empowered nor inclined to revise.

██ There has been some trivial disputation as to the present contents of the PBA's constitution and bylaws. Consistent with the organization's original certificate of incorporation, Article 3, Section 1 of its initial bylaws provided that only members and trainees of the Long Island Railroad Police were eligible to join. Upon investigation, however, the Board found that the bylaws were amended in 1977 to permit membership by employees of other carriers in "self-governing affiliate locals." True to its practice in this case of leaving no stone unturned, BRAC has tended before this court to question the existence of evidence to support this finding. But the effort is futile. There was ample basis for the determination, surely sufficient under the rule of *Switchmen's Union, supra,* to end further inquiry by the court.

The final contention in this case (perhaps not altogether consistent with the preceding point), and the only one which has given the court pause, is BRAC's objection that Amtrak employees will be denied rights under the LMRDA if they select the PBA as their representative. The claim is that under the present constitution and bylaws, Amtrak police officers who join the affiliated local will not have rights to participate in elections of officers of the parent association, to attend its meetings, or to vote on proposed changes in its bylaws. It is thus alleged that on their face, the bylaws disclose violations of LMRDA § 101(a), 29 U.S.C. § 411(a), which provides in pertinent part:

"Every member of a labor organization shall have rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

In its cursory dismissal of this objection, the NMB said simply that the LMRDA "has no applicability to the issue of PBA's qualifications as a representative under the Railway Labor Act." As thus stated, and as thereafter reaffirmed in this court, the position was that rights of union members, no matter how basic or how drastically denied by the organization, could not concern the Board. In other words, a clear and explicit violation of the LMRDA or of the United States Constitution—for example, by a union's practice of racial discrimination, cf. *Steele v. Louisville & N. R. R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)—would receive the same short shrift. If the case genuinely involved so stark a proposition, it would give far more pause than it has. Whatever the literal reach of *Leedom v. Kyne, supra,* its implications, as somewhat elaborated in the intervening years, would at least make it doubtful that the NMB could proceed toward the installation of a labor organization without regard to the organization's flagrant disregard of fundamental employee rights. Cf. *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); *International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S. S. Clerks, supra,* 131 U.S.App.D.C. at 64, 402 F.2d at 205. See also *Fay v. Douds,* 172 F.2d 720 (2d Cir. 1949).

The court has come to recognize, however, that this possible line of concern need not be followed in this case. It has become evident that the LMRDA violations anticipated or perceived by the plaintiffs are at most debatable, and probably nonexistent—certainly not clear, flagrant, or conceded by anyone. Whatever the NMB might be re-

quired to do in the clear case, this is plainly one where that agency could wisely and properly defer to the normal forums (mainly judicial) for LMRDA enforcement.

BRAC's LMRDA argument depends upon a reading of the PBA constitution and by-laws with a resolute premise that the organization will construe these basic provisions to accomplish illegal objectives. Following references of an even less persuasive nature, the thesis has come to center upon the provision which will place Amtrak police officers, should they elect the PBA,[7] within an "affiliate local:"

> "Members of other police departments and/or organizations and trainees thereof, shall be eligible to join this Association as self-governing affiliate local(s) of the Police Benevolent Association Long Island Railroad Police, Inc." [8]

BRAC concedes that Amtrak police officers will have full participation rights within the affiliated local, but maintains that they may be denied full LMRDA rights with respect to participation in the affairs of the parent body, depending upon the interpretation given to the terms "member," "Membership," and "Association" in various provisions of the assertedly offending bylaws.[9] Since it is the parent body and not the local which appears on the ballot and is seeking representative status, BRAC contends that these possible violations of rights assured by federal law must be a ground for excluding PBA from the election.

As noted earlier, the merits of this claim are dubious at best. In at least two respects, the problem is wholly hypothetical. First, it is not at all clear that if PBA wins the election, its bylaws will be given the restrictive reading for which BRAC contends, when the effect would be to exclude from participation in union affairs employees whose allegiance the PBA has vigorously sought in an election campaign now nine months long. The likely outcome is quite the contrary. On the same reasoning, if the present bylaws must somehow be interpreted to bar participation by Amtrak police officers to the extent required by the Landrum Griffin Act, there is every reason to believe PBA would take whatever steps are necessary to remedy the defects. Furthermore, the grievance is addressed to a formality; BRAC concedes that actual representation of Amtrak officers would be undertaken by the affiliated local, for which the parent body would hold the NMB certification in the manner of a trustee.

■ Where, as here, the union documents disclose at most topics for debate about LMRDA questions, the NMB is on sound ground in bypassing the subject. The paramount interest in speedy resolution favors this course. The existence of primary jurisdiction elsewhere points to the same conclusion.[10] In sum, the court can-

---

7. Of course, if the PBA is not elected, the whole subject becomes moot. Cf. *Ruby v. American Airlines, Inc., supra,* 323 F.2d at 253, n. 7.

8. Article 3, Section 1(b), Constitution and By-Laws of the Police Benevolent Association Long Island Railroad Police, Inc., as amended. Affidavit of John O'B. Clarke, Jr. in support of *Motion for Preliminary Injunction,* Ex. 2.

9. E. g., Article 9, Sections 1–2, which provide that amendments to the bylaws may be "proposed by any member of the Association in good standing," and, if approved by the Executive Committee, "shall be presented to the next General Membership meeting as a matter to be placed on a ballot for a Membership vote." Id., Ex. 1.

10. LMRDA § 102, 29 U.S.C. § 412, authorizes a civil action in federal district court where a union member claims infringement of Title I rights. The Act's legislative history supports to some extent the view that violations were not to be redressed by exclusion from Board processes. The Senate Committee on Labor and Public Welfare gave as one of the three guiding principles of the bill it reported the premise that "[r]emedies for abuses should be direct," and explicitly rejected "the notion of applying destructive sanctions to a union, i. e., to a group of working men and women, for an offense for which the officers are responsible and over which the members have, at best, only indirect control" S.Rep. No. 187, 86th Cong., 1st Sess. 7, reprinted in [1959] U.S.Code Cong. & Admin.News, pp. 2318, 2323. Further, the committee rejected a provision in the Administration bill imposing as a penalty for violations of the financial and administrative re-

not say that the NMB neglected its statutory duties under the Railway Labor Act by declining to explore the proposed questions under the Landrum Griffin Act.

For the reasons stated, the motion for a preliminary injunction is denied and the complaint is dismissed.[11]

It is so ordered.

porting sections of the Act the denial of the services of the National Labor Relations Board in settling labor disputes, on the grounds that such an indirect sanction would be ineffective against strong unions not dependent on the services of the Board; that loss of such services would deprive innocent union members and the public as well as the offending officers; and that prior experience showed that "conditioning the use of NLRB processes on compliance with not wholly related requirements such as this can result in a frustration of the principal purpose of the National Labor Relations Act, that is, settlement of labor disputes in an orderly, efficient, and expeditious manner." Id. at 9, [1959] U.S.Code Cong. & Admin.News at 2325-26. This is, of course, not precisely dispositive of the question before us, as the theory behind the enforcement of the reporting sections of LMRDA seems to differ in many respects from Congress's view of Title I.

With the same *caveat,* the NMB's view is also supported by the persuasive authority of the NLRB, which has held that compliance with the requirements of LMRDA is not a condition precedent either to filing an election petition under section 9(c) of the NLRA, 29 U.S.C. § 159(c), or to participation in an election ordered on the petition of another union, and has in general taken the position that that Board is not the proper forum in which to litigate issues arising under LMRDA. *Inyo Lumber Co.,* 129 NLRB 79 (1960); *The Terminal System,* 127 NLRB 979 (1960); *The Wright Line, Inc.,* 127 NLRB 849 (1960). In addition, at least one court of appeals has declined to set aside an NLRB order to bargain despite the claim that the union was violating LMRDA, on the theory that (presuming the adequacy of LMRDA remedies) enforcement of LMRDA does not require "the additional 'drastic' remedy of union non-recognition." *Warner Press, Inc. v. National Labor Relations Board,* 525 F.2d 190, 196 (7th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976).

11. It was agreed all around at oral argument that this is a case in which the whole story will be told, one way or the other, by the decision on the motion for a preliminary injunction. Cf. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1962).

Therefore, it was agreed that if the denial of the preliminary injunction were affirmed, dismissal of the complaint would be a corollary consequence, not warranting further submissions, while reversal would entail converse results in similar fashion. Accordingly, it saves trouble and procedural formalities to include dismissal of the complaint in today's *nisi prius* disposition.