**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES, et al.,
Plaintiffs,**

v.

**GUILFORD TRANSPORTATION INDUSTRIES, INC., et al.,
Defendants.**

**Civ. No. 92–173–P–C.**

United States District Court,
D. Maine.

Dec. 9, 1992.

John D. Gleason, Curtis Thaxter Stevens Broder & Micoleau, Portland, ME, Elizabeth A. Nadeau, Highsaw, Mahoney & Clarke, Washington, DC, for plaintiffs.

Suzanne E. Groff, Sheehan, Phinney, Bass & Green, Portsmouth, NH, Ernest J. Babcock, Friedman & Babcock, Charles S. Einsiedler, Jr., Portland, ME, for defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiffs in this action are four labor unions, the Brotherhood of Maintenance of Way Employes (BMWE), Brotherhood of Railroad Signalmen (BRS), International Association of Machinists and Aerospace Workers (IAM), and International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers (IBB & B). These unions have been certified to represent various crafts and classes of employees of the Guilford Rail Division, a single rail transportation system comprised of the four Defendant Railroads, the Boston & Maine Corporation (B & M), Maine Central Railroad Company (MEC), Portland Terminal Co. (PT), and Springfield Terminal Railway Company (ST). The fifth Defendant, Guilford Transportation Industries, Inc. (GTI) is a holding company for the four Defendant railroads. Plaintiffs seek preliminary and permanent injunctive relief to prevent Defendants from refusing to bargain with them. Now before the Court are the parties' cross-motions for summary judgment. Docket Nos. 11 and 23. Defendant GTI has also filed a motion to dismiss the complaint. Docket No. 18.

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment must demonstrate an absence of evidence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). When the moving party has come forward with probative evidence establishing its entitlement to judgment, the nonmoving party must set forth specific facts showing that there remains a genuine and material issue of fact to be resolved at trial. *Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir.1990). In making its determination, the Court must view the record in the light most favorable to the nonmoving party. *Id.* at 73.

The following undisputed facts and procedural history provide the backdrop for this dispute. The four Defendant railroads are wholly-owned subsidiaries of Defendant GTI. In the 1980s ST leased the rail lines of the three other Defendant railroads and became the provider of rail service on those lines. By the terms of the lease agreements, all personnel necessary for work on the leased lines were to be provided by ST. The leases were exempted from regulation by the Interstate Commerce Commission under 49 U.S.C. § 10505. As a condition to the Commission's approval of any transaction involving a rail carrier or carriers, the Interstate Commerce Act requires it to impose labor protective conditions to provide for and compensate employees affected by transactions such as the leases effected here. 49 U.S.C. § 11347. In this case, by order issued in February 1988, the ICC imposed a modified version of the employee protective conditions set forth in *Mendocino Coast Ry., Inc.,* 354 I.C.C. 653 (1980), *as modified at* 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Executives' Ass'n v. United States,* 675 F.2d 1248 (D.C.Cir.1982). ICC Finance Docket No. 30965 (February 17, 1988).

The ICC also mandated an opportunity for Defendant railroads and their employees to participate in formulating an implementing agreement for the leases. *Id.* The matter was submitted to arbitration, and Arbitrator Kasher issued an award adopting an implementing agreement. The ICC granted administrative review of that award. The Kasher award had imposed

the collective bargaining agreements of the lessors, B & M, MEC, and PT. By order served January 10, 1989, the ICC refused to affirm that part of the implementing award, concluding that the imposition of the lessors' collective bargaining agreements "effectively foreclosed the transactions [the leases] authorized by the Commission." ICC Finance Docket No. 30965, at 2 (October 23, 1989).[1] The ICC ordered further mediation or binding arbitration to reach an implementing agreement.

In February 1989, before an acceptable implementing agreement had been reached, the ST and the United Transportation Union (UTU), which historically had represented ST's workers by voluntary recognition, entered into a collective bargaining agreement. That agreement contained a moratorium provision under which neither party to the agreement would seek to change rates of pay or working conditions by means of a section 6 notice before June 1, 1994.

In its decision of October 23, 1989, the ICC addressed, *inter alia,* a petition by the Railway Labor Executives' Association (RLEA) seeking recognition by the ICC that the collective bargaining agreement between ST and UTU was not an implementing agreement. The ICC so held, noting, however, that the collective bargaining agreement might serve as the starting point for an implementing agreement. ICC Finance Docket No. 30965, at 5–6 (Oct. 23, 1989). More mediation or binding arbitration was ordered, and as a result, Arbitrator Harris designed an implementing agreement addressing Selection of Forces, Preservation of Equity and Applicable Collective Bargaining agreements (the Harris Award). The ICC upheld the award, which provides that "ST, in operating the leased lines, facilities and properties, shall apply the rates of pay, rules and working conditions of the lessor carriers," with certain exceptions which are not relevant here. ICC Finance Docket No. 30965 (Sub–No. 1)

*Delaware and Hudson Railway Co.— Lease and Trackage Rights Exemption— Springfield Terminal Railway Co.* (served Oct. 4, 1990), *appeal pending* Nos. 90–1484 *et al.* (D.C.Cir.1990). The Harris Award is currently on appeal in the United States Court of Appeals for the District of Columbia.

In late 1990 and early 1991, a number of unions, including Plaintiffs, filed applications with the NMB pursuant to 45 U.S.C. § 152, Ninth, alleging the existence of representation disputes involving employees of the GTI rail system, with operating components of MEC, PT, ST, & B & M.[2] Plaintiffs sought certification of their unions, asserting that the wholly-owned subsidiaries of GTI (the other Defendants here) operate as a single rail system for which ST performs the movement of traffic for the others. GTI argued that it should be dismissed because it is not a carrier and that ST, the lessee of the other lines should be treated as the carrier for representation purposes.

The NMB resolved the issue, finding that the B & M, MEC, PT and ST constitute a single transportation system, which can be referred to as Guilford Rail Division (GRD). *Applications of Brotherhood of Maintenance of Way Employes, et al.,* 18 NMB No. 76, 413, 436 (1991). The NMB held specifically, however, that "[t]his does not constitute a finding that GTI is a carrier, but rather that its rail components function as a single transportation system." *Id.* at 437. Because GTI was not the carrier at issue, the Board dismissed the Plaintiffs' applications. *Id.* at 439. Because of the unique nature of the labor relationships resulting from the lease transactions, the NMB rejected both ST's argument that it must extinguish all certifications on the lessor carriers and the unions' argument that it must extend their certifications to cover the entire system. *Id.* at 438.

---

1. The Commission specifically declined to find that the work rules then in effect on the ST provided a fair and workable arrangement to cover employees who had transferred to the ST from the other lines and on remand sought further information about the agreement and the methods of its implementation. ICC Finance Docket No. 30965 (Oct. 23, 1989), at 2.

2. Plaintiff BRS's application alleged such a dispute concerning Signalmen on the ST.

The Board allowed the unions to refile their applications seeking to represent the various crafts and classes on GRD instead of GTI, and an election was planned. *Id.* A mediator determined which union was the incumbent entitled to the first position on the ballot. On appeal of the mediator's decision, the NMB noted that as a result of the lease transactions, employees of the leased carriers became ST employees. The Board found that the UTU had "represented GRD employees through voluntary recognition by the carrier since the lease transactions" and that the UTU had bargained with the ST on their behalf. *Guilford Rail Division,* 19 NMB No. 8, 32, 35 (1991). It concluded, therefore, that the UTU was the incumbent within the meaning of 45 U.S.C. § 151, Sixth. *Id.*

After the election, the NMB certified Plaintiffs as representatives of employees of Guilford Rail Division. Some of the Plaintiffs contacted Mr. Roland Dinsmore to set up meetings regarding contract administration.[3] At the meetings which were held Plaintiffs were informed that ST would refuse to bargain based on the moratorium clause in its collective bargaining agreement with the UTU and that the other component companies of GRD would refuse to bargain because they did not have any employees. Plaintiffs were also told that there were no outstanding section 6 notices to discuss. Plaintiff IAM served a section 6 notice on David Fink, ST's president.

After these meetings, in July 1992, Plaintiffs each sent letters addressed jointly to "The Highest Designated Officer for Service of Section 6 Notices, Guilford Transportation Industries, Inc.," "Mr. R.E. Dinsmore, Assistant Vice President–Human Resources, Operating Components of Guilford Rail Division: Boston & Maine Corporation, Maine Central Railroad Company, Portland

Terminal Company," and "Mr. D.F. Sibley, Director–Labor Relations, Springfield Terminal Railway Co."[4] Each letter included a section 6 notice seeking to amend the current agreements on the B & M, MEC, and PT for the "system-wide craft or class of employees of the railroad subsidiaries of GTI's Rail Division." The letters stated that the notice was sent to each recipient

so that there will be no misunderstanding as to our objective to negotiate a single agreement for the system-wide craft or class of employees which we represent on the railroad operating subsidiaries of [GTI's] Rail Division, including the ST, B & M, MEC, PT and any future rail subsidiaries which GTI may directly or indirectly acquire, create or control.

The letters went on to say that if there were separate representatives for the corporations comprising GRD, Plaintiffs planned to conduct joint negotiations as contemplated by the NMB in its July 1991 decision, 18 NMB 413.

R.E. Dinsmore responded to the letters from each Plaintiff in several different capacities. He responded to all who had included GTI among their addressees, saying that since GTI is not a rail carrier, it does not have an officer designated to receive Section 1 Sixth notices. He also responded with separate letters signed by him as Assistant Vice President–Human Resources for either the B & M or for the MEC/PT. Each letter, except that from Dinsmore wearing his B & M hat to the BMWE, acknowledged receipt of the prior transmittal by the union and stated that since the railroad did not have any employees in the craft or class represented by the union, it would not entertain the Section 1 Sixth notices. Dinsmore agreed to meet with regard to three maintenance of way em-

---

3. Plaintiffs assert that Dinsmore was a representative of GRD. Defendants dispute that fact, saying that contact was made and meetings were held with ST officials. The distinction does not seem well-taken since Dinsmore was Assistant Vice President of Human Resources for the B & M and MEC/PT. As such he was clearly an official of some of the components of the GRD.

4. Plaintiff BRS, which had taken a slightly different position regarding the denomination of the single rail system before the NMB, addressed its letter only to Dinsmore, for the operating components of GRD, and Sibley of the ST.

ployees on the B & M. Sibley responded to each Plaintiff's letter for the ST, stating that the Section 1 Sixth notice was premature because of the moratorium provision contained in the collective bargaining agreement between the UTU and ST, which postponed the service of any such notices until June 1, 1994. The letters from ST agreed to discuss the administration of that agreement.

Also during this period the NMB was asked by Plaintiff BRS to reactivate mediation on two cases between the BRS and MEC/PT and the B & M. Dinsmore responded on behalf of the B & M and MEC/PT saying that they objected to the reactivation on the grounds that those companies are not operating entities and have no operating employees. The NMB granted the reactivation before receiving Dinsmore's objection. Dinsmore requested reconsideration, and in response the BRS urged the NMB to defer its reactivation until after this Court's decision in this case.

## DISCUSSION

### I.

Section 2 Ninth of the RLA charges the NMB with investigating representation disputes among railway employees and certifying which labor organization represents which employees. That section also provides that when the carrier has received notice of the certification it *"shall treat* with the representative so certified as the representative of the craft or class for the purposes of this Act." 45 U.S.C. § 152 Ninth (emphasis in original). This obligation is enforceable by the federal courts. *Virginian Ry. Co. v. System Federation*

*No. 40,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937). Plaintiffs argue that since the NMB has certified them as the representatives of employees on the Guilford Rail Division, Defendants, as the component railroads of the single transportation system and their holding company, have a duty to bargain with them.

Defendant GTI and the individual railroads have refused to bargain with Plaintiffs. GTI asserts that it is not a carrier. The B & M and MEC/PT assert that they have no employees in the various crafts and classes represented by Plaintiffs, except for the very few maintenance of way employees working on the B & M. ST, which all the Defendants regard as the employer of the vast majority of those employees Plaintiffs seek to represent, asserts that it will not bargain because of the moratorium provision included in its agreement with Plaintiffs' predecessor, the UTU. Plaintiffs are left, then, without anyone with whom to bargain.[5]

 The Court is satisfied that, barring any external barriers,[6] GRD does have a duty to bargain with Plaintiffs, which cannot be avoided merely because there is no formal legal entity called GRD. The NMB has found that Defendants ST, MEC, PT, and B & M comprise a single transportation system carrier called GRD, with employees which, prior to the finding of the single system, were for the most part, employees of ST. *Applications of BMWE et al.,* 18 NMB at 436; *Guilford Rail Division,* 19 NMB at 35. Section 152, Ninth, is explicit in its directive that once the carrier and employee representatives are certified by the NMB, "the carrier shall treat with the representative so certified." [7]

"GRD," and that all rail operations are performed by employees of ST.

6. Arguments concerning barriers to bargaining will be discussed *infra.*

7. While the railroads may have a unitary duty to bargain, GTI plainly does not. The NMB specifically distinguished GTI from GRD, finding that GTI was "not the carrier." This investigative finding by the NMB is unreviewable. *Switchmen's Union v. NMB,* 320 U.S. 297, 300, 64 S.Ct. 95, 96, 88 L.Ed. 61 (1943). If the Court were to order GTI to treat with the certified

5. Moreover, in its Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, joined by the other carrier Defendants, Defendant ST states:

ST recognizes the NMB's finding of a single transportation system for representation purposes, for which the NMB uses "Guilford Rail Division" as a short-hand reference. 18 N.M.B. at 437. All rail operations are performed by ST, however, and all employees performing work are employed by ST. References in the Memorandum to "ST," rather than to "GRD," simply reflect the fact that in reality there is no such corporate entity as

In *Burlington Northern R.R.*, 19 NMB 288 (1992), the NMB explained that its role is to identify the scope of the carrier and the scope of the craft or class. Noting that "a single representative for the system-wide craft or class is meant to facilitate collective bargaining and provide labor-management stability," *id.* at 292, *quoting Grand Trunk Western R.R.*, 19 NMB 226 (1992), the Board went on to state the obvious: "The Board's determinations would be rendered pointless if a party chose, after such findings, to bargain through whatever form or on behalf of whatever group or entity it unilaterally chose." *Id.* at 293. The Board also explained, however, that "it is up to the carrier and the certified representative to determine who specifically should represent their respective interests at the bargaining table." *Id.*

As discussed above, the Board's findings in the instant case were very clear, and are not disputed by the parties. GRD is the carrier which must treat with the certified unions. Plaintiffs here served section 6 notices on the railroads which make up the single transportation system known as GRD, and the letters accompanying the notices made clear that each Plaintiff wished to negotiate a single system-wide agreement for the employees of "the subsidiaries of [GTI's] Rail Division, including the ST, B & M, MEC, PT and any future rail subsidiaries which GTI may directly or indirectly acquire, create or control."

As the NMB's opinion in *Burlington Northern R.R.*, 19 NMB at 292 suggests, the coy response of ST and the other component carriers, acknowledging the NMB's finding that GRD is the carrier, but responding as individual entities, could pose a threat to labor stability and undercut the policies of the RLA. However, by taking the lead in responding to Plaintiffs' motion and in filing a cross-motion for summary judgment, both of which have been joined by the other railroad components of GRD, ST is *de facto* the GRD designee to represent the system's interests.

unions, it would be declaring GTI a carrier, thus encroaching on the decisional sphere entrusted by the RLA to the NMB. This Court, therefore,

## II.

The primary argument made by ST on behalf of itself and the other GRD component railroads is that the moratorium provision of the 1989 collective bargaining agreement between ST and UTU precludes any bargaining between the carrier and the representatives of the GRD employees before June, 1994. ST also contends that resolution of the issue requires merely interpretation and application of the moratorium provision in the collective bargaining agreement between ST and the UTU. Therefore, ST insists that this case presents a minor dispute which is assigned by the RLA to compulsory and binding arbitration before the National Railroad Adjustment Board. Plaintiffs argue that the dispute is not over possible meanings of the moratorium provision, but rather over whether it applies to Plaintiffs and bars the service of Section 6 notices. Therefore, Plaintiffs urge that a major dispute is presented, requiring the exercise of jurisdiction by the Court under the RLA.

■ The Supreme Court has recently discussed the delineation between major and minor disputes in *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 305, 310, 109 S.Ct. 2477, 2481, 2484, 105 L.Ed.2d 250 (1989):

> [T]he line drawn ... looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement....

> . . . . .

> We hold that if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (i.e., the claim

is without jurisdiction to grant the relief requested against GTI, and GTI must be dismissed as a defendant.

is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.[8]

■ If the Court were to accept the ST–UTU collective bargaining agreement as the governing agreement here, there would be no question that the parties' dispute is minor, to be left for resolution by an arbitration board. The dispute presented here, however, is not "merely a disagreement over the meaning or coverage of the contract." *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794, 797 (1st Cir.1986). Rather it goes to the validity of the collective bargaining agreement, an inquiry that is appropriately left to judicial consideration. *Felter v. Southern Pacific Co.*, 359 U.S. 326, 327 n. 3, 79 S.Ct. 847, 850 n. 3, 3 L.Ed.2d 854 (1959); *Order of Ry. Conductors and Brakemen v. Switchmen's Union*, 269 F.2d 726, 728 (5th Cir.1959); *Taylor v. United Transportation Union*, 614 F.Supp. 1320, 1322 (E.D.La.1985).[9]

### III.

■ Plaintiffs argue that the ST–UTU collective bargaining agreement does not apply to them because neither they nor GRD are parties to it, and the UTU could not prospectively waive their rights to bargain. This argument has some emotional appeal, but Plaintiffs have offered no support for it. It is clear from the findings of the NMB that the UTU represented ST's employees by voluntary recognition after the lease transactions. The pertinent question is whether the contract containing the moratorium which was negotiated by the UTU after the leases remains in effect after the employees' bargaining representatives change.

Relying on *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 284 n. 8, 92 S.Ct. 1571, 1580 n. 8, 32 L.Ed.2d 61 (1972), Plaintiffs argue that the terms of a previously-negotiated collective bargaining agreement do not bind a newly certified union. In *Burns*, a case brought under the National Labor Relations Act rather than under the RLA, the Supreme Court stated:

> When the union that has signed a collective bargaining contract is decertified, the succeeding union certified by the Board is not bound by the prior contract, need not administer it, and may demand negotiations for a new contract, even if the terms of the old contract have not yet expired.

*Id., citing American Seating Co.*, 106 NLRB 250 (1953). Although in certain respects, doctrines developed under the NLRA may be instructive in construing the RLA, *see Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 432, 109 S.Ct. 1225, 1229, 103 L.Ed.2d 456 (1989), the Court does not think that the *American Seating Rule* relied upon by the Supreme Court in *Burns* is applicable in the context of rail labor disputes.

In its First Annual Report, the NMB stated that "a change in representation does not alter or cancel any existing agreement made in behalf of the employees by their previous representatives." The First Annual Report of the NMB at 23–24 (1935).[10] The NMB has repeatedly reaffirmed this position since 1935. *See, e.g., Metro–North R.R.*, 10 N.M.B. 345, 349

---

8. As the Court of Appeals for the First Circuit has stated: "[I]n order for there to be a finding that a dispute is "major", there must be a showing that the company's defense constitutes a "substantial and clearly apparent change" in the existing collective bargaining agreement." *Airlines Stewards and Stewardesses Ass'n, Local 550 Transport Workers Union v. Caribbean Atlantic Airlines, Inc.* 412 F.2d 289, 291 (1st Cir.1969).

9. The Court notes that even if the dispute were to be considered "minor," the result in this forum would be the same, since dismissal for lack of jurisdiction would be required. *See* order, *infra,* at 55.

10. The Board went on to say that "[i]f a change in agreement is desired, the new representatives are required to give due notice of such desired change as provided by the agreement or by the Railway Labor Act. Conferences must then be held to agree on the changes exactly as if the original representative had been continued." First Annual Report, at 24.

(1983); *Lehigh Valley R.R. Co.*, 3 N.M.B. 225, 226 (1960). In its 42nd Annual Report, the Board repeated the proposition, explaining that

> [t]he purpose of such a policy is to emphasize a principle of the Railway Labor Act that agreements are between the employees and the carrier, and that the change of an employee representative does not automatically change the contents of an agreement. The procedures of Section 6 of the Railway Labor Act are to be followed if any changes in agreements are desired.

*Air Transport Employees v. Western Airlines, Inc.* 105 L.R.R.M. 3004 (C.D.Cal. 1980) (*citing* 42nd Annual Report of National Mediation Board for 1976, at 39).[11] Moreover, very recently the NMB has also made clear that when it applies its merger procedures to determine representation in the context of transactions among rail carriers like the leases here, there is "no effect on the survival of existing collective bargaining agreements." *Merger Procedures*, 17 N.M.B. 44, 54 (1989).[12]

Not only has the NMB consistently stated that collective bargaining agreements

continue even when representatives change, but this position has also been noted and accepted by a number of federal courts. *See International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.*, 843 F.2d 1119, 1123, *vacated as moot*, 854 F.2d 1088 (8th Cir. 1988); *International Bhd. of Teamsters v. Texas International Airlines, Inc.*, 717 F.2d 157, 163 (5th Cir.1983); *Air Transport Employees v. Western Airlines, Inc.*, 105 L.R.R.M. 3004 (C.D.Cal.1980); *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.*, 406 F.Supp. 492, 507 n. 23 (N.D.Cal.1976). In *Aircraft Mechanics Fraternal Ass'n v. United Airlines*, the court, citing the NMB's First Annual Report, specifically noted the difference in the positions taken by the NMB and the NLRB concerning the binding effect upon a successor representative of long-term contracts negotiated by a predecessor union. *Id.* The court attributed the difference in position to the added policy imperative under the RLA to further the national interest by avoiding disruption in the railroad and airline industries. *Id.*[13]

---

**11.** Plaintiffs argue that the 42nd Annual Report's directive that "the procedures of Section 6 of the Railway Labor Act are to be followed if any changes in agreements are desired" indicates that the NMB does not intend for moratorium provisions to be carried over from one representative to the next. Other courts have found that moratorium provisions do not violate the policies behind section 6 of the RLA, and indeed that "such a construction 'would convert an act intended as an instrument for achieving industrial peace into a potent weapon for perpetual warfare.'" *Lenfest v. Boston & Maine Corp.*, 537 F.Supp. 324, 337 (D.Mass. 1982), *quoting Seaboard World Airlines, Inc. v. Transport Workers Union*, 443 F.2d 437 (2nd Cir.1971). The Court does not believe that the Forty–Second Annual Report's reference to the RLA is meant as a change from the First Annual Report's directive to follow the procedures of the agreement or the RLA. Certainly the duty to make and maintain agreements is a fundamental precept of the RLA. *Chicago & North Western Ry. v. United Transportation Union*, 402 U.S. 570, 574, 91 S.Ct. 1731, 1734, 29 L.Ed.2d 187 (1971).

**12.** In 1950 the NMB added a gloss to the language in the First Annual Report, stating:

> This policy is based upon the 30–day provision in section 6 of the Railway Labor Act and is not intended to sanction agreements made

with an incumbent representative for any stated period in excess of 30 days which would have the effect of precluding a new or different representative from functioning as contemplated in section 6 of the act, especially where the question of representation is an active issue at the time the agreement is signed.

*Fifteen Years Under the Railway Labor Act, Amended and the National Mediation Board* 19 (1950). This limitation does not appear to have been cited again by the NMB, and courts addressing the issue subsequent to 1950 have used the broad formulation of the principle. As previously discussed, however, the Court rejects the argument that moratorium provisions precluding bargaining for a specific amount of time are violative of the RLA or detrimental to its policies. *See* note 11, *supra*. Thus, it could be that the NMB tacitly recognized that collective bargaining agreements containing moratorium provisions served to preserve the transportation industry's labor stability and decided to abandon the limitation on the continuation of contracts expressed in *Fifteen Years Under the RLA*.

**13.** The court notes that the Court of Appeals for the First Circuit in a different context has declared itself "persuaded by the careful research and analysis of *Aircraft Mechanics*." *Texidor v. Ceresa*, 590 F.2d 357, 359 (1st Cir.1978).

The only federal court to address the issue whether a moratorium provision negotiated by a predecessor union precludes bargaining by a successor union before the moratorium has expired relied on the NMB's assertion of the principle discussed above. *See, Long Island R.R. v. Local 808,* 67 L.R.R.M. 2463, 2464 (E.D.N.Y. 1967). In that case Defendant, the successor union, had apparently threatened a strike in part because the carrier refused to negotiate items which were subject to the moratorium agreed to by Defendant's predecessor union. *Id.* Without much discussion, the court cited to an exhibit in which the NMB had determined that the preexisting collective bargaining agreement "is binding and subsequent change of certified representatives does not alter or cancel any existing agreement made in behalf of the employees by their previous representatives." *Id.* Based on that exhibit and other evidence, the court granted an injunction against the planned work stoppage, on the grounds that it violated the RLA. *Id.*

This Court is satisfied that the NLRB policy adopted by the Supreme Court in *Burns,* that a successor union is not bound by the terms of a collective bargaining agreement negotiated by a predecessor un-

ion, does not apply in the context of the Railway Labor Act. Rather, the Court adopts the NMB's position that a collective bargaining agreement is not altered or cancelled by a change in representatives. The NMB has determined that at the time of the certification elections establishing Plaintiffs as the bargaining representatives for GRD employees, the UTU was the incumbent representative of those employees. *Guilford Rail Division,* 19 NMB at 33. This factual determination is unreviewable. *See, Switchmen's,* 320 U.S. at 298–99, 64 S.Ct. at 96.[14] Thus, the ST–UTU agreement is an existing agreement made on behalf of those now known as GRD employees by their former representatives, which is not altered or cancelled by the NMB's certification of Plaintiffs as the GRD employees' new representatives.[15]

## IV.

Even though the collective bargaining agreement between the UTU and ST is still in effect, there remains a question about the validity of the moratorium provision. Arbitrator Harris devised an implementing agreement for the *Mendocino Coast* labor protective provisions imposed by the ICC

14. *Switchmen's* actually held that the federal courts have no power to review the action of the NMB in issuing certification. *Switchmen's Union,* 320 U.S. at 298–99, 64 S.Ct. at 96. Part of the Board's unreviewable power to investigate representational disputes includes the authority to designate who may participate in an election and what rules will govern the election. It seems clear that in order to further the policies set forth in *Switchmen's,* the facts found by the Board leading up to its certification must also be unreviewable.

15. Plaintiffs also argue that Defendants cannot rely on the moratorium clause because the employees whom plaintiffs represent did not authorize the UTU to act for them. The gist of the argument is that Defendants chose the UTU and that such choice by the employer violates the Section 2, Fourth of the RLA. The NMB has already addressed Plaintiffs' argument that "UTU's claim to represent all ST employees is a result of ST's grant of recognition to UTU in order to "interfere with the rights of those employees under Section 2, Fourth of the Railway Labor Act, 45 U.S.C. § 152, Fourth" to be represented by a union of their choice. *Guilford Rail Division,* 19 NMB No. 8, at 34. The Board went

on to find that "UTU has represented GRD employees through voluntary recognition by the carrier since the lease transactions." *Id.*

The Board has established a policy of non-interference in voluntary recognition matters except where such recognition would be in derogation of an existing Board certification. This policy derives from the belief that voluntary recognition enhances the goal of stable labor relations. *Association of Flight Attendants,* 14 NMB 218, 234 (1987). The Board here did not extinguish the certifications on the lessor carriers because of the leases. In finding voluntary recognition of the ST in the face of Plaintiffs' objections, however, it must have concluded that such recognition was not in derogation of an existing certification.

These determinations were made by the NMB in its investigation of a representation dispute. This Court does not have the jurisdiction to decide representation issues like the one Plaintiffs seek to raise. *Texidor v. Ceresa,* 590 F.2d at 359–60. As the court stated in *Texidor,* "we will not substitute our judgment for the NMB's right to decide that the need for *some* representative and *some* agreement that avoids interruption of transportation outweighs the need to avoid possible undue influence."

for the protection of the workers on the leased lines owned by B & M and MEC/PT. That award,[16] which postdates the ST–UTU agreement, provides specifically in a section entitled "Applicable Collective Bargaining Agreement" that the ST, in operating the leased lines, facilities and properties, shall apply the rates of pay, rules and working conditions of the lessor carrier with certain exceptions. Plaintiffs argue that the prior collective bargaining agreements with the lessor carriers also contained moratorium provisions which, by operation of the implementing agreement, supersede the moratorium provision in the ST–UTU contract because it is a rule or working condition. In his deposition Roland Dinsmore, a labor relations official for the carrier Defendants, testified that a moratorium clause "usually relates to the wage increase schedule." Needless to say, the moratorium periods in the prior agreements have expired. Thus, if they were to control, there would be no impediment to GRD's bargaining with the newly certified unions.

█ The ICC remanded the Kasher award in part for "assessment of the impact of the current ST/UTU agreement and its relationship to the development of an implementing agreement," after consideration of all parties' views. Finance Docket No. 30965, at 6 (Oct. 23, 1989). The subsequent Harris award, however, is unclear as to whether, by adopting the rates of pay, rules and working conditions of the lessor carriers, it intended to supersede the moratorium provision in the UTU agreement.

This question, which entails interpretation of the Harris award, is one over which this Court has no jurisdiction. The ICC has the authority, often delegated to arbitrators, to interpret, apply, and enforce labor protective conditions. *United Transportation Union v. United States*, 905 F.2d 463, 468 (D.C.Cir.1990). It also has the authority to review arbitration awards regarding labor protective conditions, as it has done in the course of the transactions underlying

Plaintiffs' claims here. *International Bhd. of Electrical Workers v. ICC*, 862 F.2d 330 (D.C.Cir.1988). As this Court stated earlier this year, "disputes over the interpretation or enforcement of [federally-imposed implementing agreements] are subject to mandatory arbitration under ICC jurisdiction." *Ashe v. Springfield Terminal Railway Co.*, No. 89–41–P–C, slip op. at 8 (May 4, 1992) (Cohen, Magistrate Judge), *aff'd* June 10, 1992, 1992 WL 429999 (Carter, C.J.), *appeal pending.* Since this Court has no jurisdiction to decide the issue at the core of Plaintiffs' claim for relief, this case must be dismissed.

Accordingly, it is ORDERED that Defendant GTI's Motion to Dismiss be, and it is hereby, GRANTED. It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment be, and it is hereby, DENIED. Finally, it is ORDERED that the cross-motions for summary judgment of Defendants ST, B & M, and MEC/PT be, and they are hereby, GRANTED, and this action is hereby DISMISSED for lack of subject matter jurisdiction.

SO ORDERED.

---

16. The Harris award is now on appeal in the Court of Appeals for the D.C. Circuit, argument

having been heard on September 29, 1992.